## CBS, INC. *v.* FEDERAL COMMUNICATIONS COMMISSION ET AL.

No. 80–207.   Argued March 3, 1981—Decided July 1, 1981*

*Together with No. 80–213, *American Broadcasting Cos., Inc.* v. *Federal Communications Commission et al.*, and No. 80–214, *National Broadcasting Co., Inc.* v. *Federal Communications Commission et al.*, also on certiorari to the same court.

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, STEWART, MARSHALL, BLACKMUN, and POWELL, JJ., joined. WHITE, J., filed a dissenting opinion, in which REHNQUIST and STEVENS, JJ., joined, *post*, p. 397. STEVENS, J., filed a dissenting opinion, *post*, p. 418.

*Floyd Abrams* argued the cause for petitioners in all cases. On the briefs in No. 80–207 were *J. Roger Wollenberg, Timothy B. Dyk, Ralph E. Goldberg,* and *Joseph DeFranco.* On the briefs in No. 80–213 were *James A. McKenna, Jr., Thomas N. Frohock, Carl R. Ramey,* and *Robert J. Kaufman.* With Mr. Abrams on the briefs in No. 80–214 were *Dean Ringel, Patricia A. Pickrel, Corydon B. Dunham,* and *Howard Monderer. Erwin G. Krasnow* filed a brief for the National Association of Broadcasters, respondent under this Court's Rule 19.6, urging reversal.

*Stephen M. Shapiro* argued the cause for the federal respondents in all cases. With him on the brief were *Solicitor General McCree, Deputy Solicitor General Claiborne, Robert R. Bruce,* and *C. Grey Pash, Jr.*†

---

† *Heidi P. Sanchez* and *Andrew Jay Schwartzman* filed a brief for the

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to consider whether the Federal Communications Commission properly construed 47 U. S. C. § 312 (a)(7) and determined that petitioners failed to provide "reasonable access to . . . the use of a broadcasting station" as required by the statute.   449 U. S. 950 (1980).

## I

### A

On October 11, 1979, Gerald M. Rafshoon, President of the Carter-Mondale Presidential Committee, requested each of the three major television networks to provide time for a 30-minute program between 8 p. m. and 10:30 p. m. on either the 4th, 5th, 6th, or 7th of December 1979.[1]   The Committee

---

National Citizens Committee for Broadcasting et al. as *amici curiae* urging affirmance.

[1] The text of Mr. Rafshoon's letter to the three networks read as follows:

"On behalf of the Carter/Mondale Presidential Committee, Inc., I am requesting availabilities for a thirty (30) minute program on [ABC, CBS, or NBC] between 8:00 p. m. and 10:30 p. m. E. S. T. on December 4, December 5, December 6, or December 7, 1979.   This program, to be run in conjunction with an announcement concerning his candidacy by President Carter for the Democratic nomination for President, consists of a documentary outlining the President's record and that of his administration.   At the time this program is aired, it may be assumed that President Carter will be a legally qualified candidate under the Communications Act of 1934, as amended, and that the President would appear on the program.

"As you know, the first official contest to select delegates to the Democratic National Convention occurs January 21, 1980, in Iowa, which is 47 days after December 7, 1979, our last requested date for availabilities.

"Unlike all previous Presidential election years, the news media has chosen to focus enormous attention on the Florida Caucus (October 13, 1979) and Convention (November 16–18, 1979) as well as other aspects of the 1980 campaign.   As illustration, I have noted that in the six-week period from September 1 through October 9, 1979, ABC devoted 51 minutes, 22 seconds to the 1980 campaign; CBS devoted 51 minutes, 17 seconds to this subject; and NBC devoted 70 minutes.   Therefore, our request for the above

intended to present, in conjunction with President Carter's formal announcement of his candidacy, a documentary outlining the record of his administration.

The networks declined to make the requested time available. Petitioner CBS emphasized the large number of candidates for the Republican and Democratic Presidential nominations and the potential disruption of regular programming to accommodate requests for equal treatment, but it offered to sell two 5-minute segments to the Committee, one at 10:55 p. m. on December 8 and one in the daytime.[2]  Peti-

---

time seems eminently appropriate in view of the escalating political climate already generated by both print and broadcast media.

"I will expect to hear from one of your sales representatives within the next week regarding a selection of times in order that we may choose a mutually agreeable date." App. 35–40.

[2] The letter (dated October 17, 1979) to Mr. Rafshoon from Raymond E. Dillon, Director of Political Sales at CBS, read in pertinent part:

"Because of the large number of present and potential candidates for the Republican and Democratic presidential nominations, we are at this time unable to accede to your request to purchase a half-hour program. We note that three Democrats and eleven Republicans have already announced, or may reasonably be expected shortly to announce, their presidential candidacies; indeed two candidates for the Republican presidential nomination have already requested to purchase half-hour programs on the CBS Television Network, and their requests have been declined on the same basis as indicated below.

"In light of the above circumstances, were we to provide the half-hour program you seek, accommodating potential requests for equal treatment from other candidates for presidential nomination would involve massive disruptions of the regular entertainment and information schedule of the CBS Television Network.  Accordingly, we must respectfully reject your request.

"We are, however, prepared to make one 5-minute segment in prime time and one 5-minute daytime segment available for purchase by your committee.  We note that this is the same offer made to the Republican candidates referred to above in response to their requests to purchase half-hour time periods.

"While we are unable to make available time on the dates you have specified, we are able to offer for your purchase a 5-minute period on

tioner American Broadcasting Cos. replied that it had not yet decided when it would begin selling political time for the 1980 Presidential campaign,[3] but subsequently indicated that it would allow such sales in January 1980. App. 58. Petitioner National Broadcasting Co., noting the number of potential requests for time from Presidential candidates, stated that it was not prepared to sell time for political programs as early as December 1979.[4]

On October 29, 1979, the Carter-Mondale Presidential Committee filed a complaint with the Federal Communications Commission, charging that the networks had violated

December 8 between approximately 10:55 and 11:00 PM. We will also provide a specific 5-minute daytime availability for your purchase on request." *Id.*, at 44–45.

[3] The letter (dated October 23, 1979) to Mr. Rafshoon from Charles C. Allen, Vice President for Sales Administration at ABC, read in pertinent part:

"[T]he ABC Television Network has not reached a decision as to when it will start selling political time for the 1980 Presidential campaign, and, accordingly, we are not in a position to comply with your request. As I mentioned on the telephone, I believe that later this year a decision will be made to make political time for the Presidential campaign available on ABC–TV early next year." *Id.*, at 41.

[4] The letter (dated October 23, 1979) to Mr. Rafshoon from Joseph J. Iaricci, Vice President for Sales and Administration at NBC, read in pertinent part:

"We have evaluated your request carefully. Based upon our experience with past campaigns, we believe it is too early in the political season for nationwide broadcast time to be made available for paid political purposes. In addition, we believe that honoring your request at this early stage of the Presidential campaign would require NBC to honor similar requests from a number of other Presidential aspirants. The impact of such an undertaking at this time is, of course, a significant factor in our decision.

"Insofar as the nomination process is now focused on political activities in individual states like Iowa, you may wish to contact stations serving those particular states.

"Please be assured that NBC News will continue to cover important and newsworthy aspects of President Carter's political activities." *Id.*, at 42–43.

their obligation to provide "reasonable access" under § 312 (a)(7) of the Communications Act of 1934, as amended. Title 47 U. S. C. § 312 (a)(7), as added to the Act, 86 Stat. 4, states:

"The Commission may revoke any station license or construction permit—

.    .    .    .    .

"(7) for willful or repeated failure to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy."

At an open meeting on November 20, 1979, the Commission, by a 4-to-3 vote, ruled that the networks had violated § 312 (a)(7). In its memorandum opinion and order, the Commission concluded that the networks' reasons for refusing to sell the time requested were "deficient" under its standards of reasonableness, and directed the networks to indicate by November 26, 1979, how they intended to fulfill their statutory obligations. 74 F. C. C. 2d 631.

Petitioners sought reconsideration of the FCC's decision. The reconsideration petitions were denied by the same 4-to-3 vote, and, on November 28, 1979, the Commission issued a second memorandum opinion and order clarifying its previous decision. It rejected petitioners' arguments that § 312 (a)(7) was not intended to create a new right of access to the broadcast media and that the Commission had improperly substituted its judgment for that of the networks in evaluating the Carter-Mondale Presidential Committee's request for time. November 29, 1979, was set as the date for the networks to file their plans for compliance with the statute. 74 F. C. C. 2d 657.

The networks, pursuant to 47 U. S. C. § 402, then petitioned for review of the Commission's orders in the United States Court of Appeals for the District of Columbia Circuit. The

court allowed the Committee and the National Association of Broadcasters to intervene, and granted a stay of the Commission's orders pending review.

Following the seizure of American Embassy personnel in Iran, the Carter-Mondale Presidential Committee decided to postpone to early January 1980 the 30-minute program it had planned to broadcast during the period of December 4–7, 1979. However, believing that some time was needed in conjunction with the President's announcement of his candidacy, the Committee sought and subsequently obtained from CBS the purchase of five minutes of time on December 4. In addition, the Committee sought and obtained from ABC and NBC offers of time for a 30-minute program in January, and the ABC offer eventually was accepted. Throughout these negotiations, the Committee and the networks reserved all rights relating to the appeal.

## B

The Court of Appeals affirmed the Commission's orders, 202 U. S. App. D. C. 369, 629 F. 2d 1 (1980), holding that the statute created a new, affirmative right of access to the broadcast media for individual candidates for federal elective office. As to the implementation of § 312 (a)(7), the court concluded that the Commission has the authority to independently evaluate whether a campaign has begun for purposes of the statute, and approved the Commission's insistence that "broadcasters consider and address all non-frivolous matters in responding to a candidate's request for time." *Id.,* at 386, 629 F. 2d, at 18. For example, a broadcaster must weigh such factors as: "(a) the individual needs of the candidate (as expressed by the candidate); (b) the amount of time previously provided to the candidate; (c) potential disruption of regular programming; (d) the number of other candidates likely to invoke equal opportunity rights if the broadcaster grants the request before him; and, (e) the timing of the request." *Id.,* at 387, 629 F. 2d, at 19. And in reviewing a broadcaster's decision, the Commission will confine

itself to two questions: "(1) has the broadcaster adverted to the proper standards in deciding whether to grant a request for access, and (2) is the broadcaster's explanation for his decision reasonable in terms of those standards?" *Id.*, at 386, 629 F. 2d, at 18.

Applying these principles, the Court of Appeals sustained the Commission's determination that the Presidential campaign had begun by November 1979, and, accordingly, the obligations imposed by § 312 (a)(7) had attached. Further, the court decided that "the record . . . adequately supports the Commission's conclusion that the networks failed to apply the proper standards." *Id.*, at 389, 629 F. 2d, at 21. In particular, the "across-the-board" policies of all three networks failed to address the specific needs asserted by the Carter-Mondale Presidential Committee. *Id.*, at 390, 629 F. 2d, at 22. From this the court concluded that the Commission was correct in holding that the networks had violated the statute's "reasonable access" requirement.

Finally, the Court of Appeals rejected petitioners' First Amendment challenge to § 312 (a)(7) as applied, reasoning that the statute as construed by the Commission "is a constitutionally acceptable accommodation between, on the one hand, the public's right to be informed about elections and the right of candidates to speak and, on the other hand, the editorial rights of broadcasters." *Id.*, at 389, 629 F. 2d, at 25. In a concurring opinion adopted by the majority, *id.*, at 389, n. 117, 629 F. 2d, at 25, n. 117, Judge Tamm expressed the view that § 312 (a)(7) is saved from constitutional infirmity "as long as the [Commission] . . . maintains a very limited 'overseer' role consistent with its obligation of careful neutrality . . . ." *Id.*, at 402, 629 F. 2d, at 34.

## II

We consider first the scope of § 312 (a)(7). Petitioners CBS and NBC contend that the statute did not impose any

additional obligations on broadcasters, but merely codified prior policies developed by the Federal Communications Commission under the public interest standard. The Commission, however, argues that § 312 (a)(7) created an affirmative, promptly enforceable right of reasonable access to the use of broadcast stations for individual candidates seeking federal elective office.

A

The Federal Election Campaign Act of 1971, which Congress enacted in 1972, included as one of its four Titles the Campaign Communications Reform Act (Title I). Title I contained the provision that was codified as 47 U. S. C. § 312 (a)(7).[5]

We have often observed that the starting point in every case involving statutory construction is "the language employed by Congress." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 337 (1979). In unambiguous language, § 312 (a)(7) authorizes the Commission to revoke a broadcaster's license

"for willful or repeated failure to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy."

It is clear on the face of the statute that Congress did not prescribe merely a general duty to afford some measure of political programming, which the public interest obligation

---

[5] Title I also provided: (a) that during a specified period before a primary or general election, a broadcast station was not permitted to charge a legally qualified candidate for any public office a fee in excess of its "lowest unit charge . . . for the same class and amount of time for the same period," 47 U. S. C. § 315 (b)(1); and (b) that in using the communications media, candidates for federal elective office were not allowed to exceed established spending limits, 47 U. S. C. § 803 (1970 ed., Supp. II), repealed, Pub. L. 93–443, 88 Stat. 1278 (1974).

of broadcasters already provided for. Rather, § 312 (a)(7) focuses on the individual "legally qualified candidate" seeking air time to advocate *"his* candidacy," and guarantees him "reasonable access" enforceable by specific governmental sanction. Further, the sanction may be imposed for "willful *or* repeated" failure to afford reasonable access. This suggests that, if a legally qualified candidate for federal office is denied a reasonable amount of broadcast time, license revocation may follow even a single instance of such denial so long as it is willful; where the denial is recurring, the penalty may be imposed in the absence of a showing of willfulness.

The command of § 312 (a)(7) differs from the limited duty of broadcasters under the public interest standard. The practice preceding the adoption of § 312 (a)(7) has been described by the Commission as follows:

> "Prior to the enactment of the [statute], we recognized political broadcasting as one of the fourteen basic elements necessary to meet the public interest, needs and desires of the community. No legally qualified candidate had, at that time, a specific right of access to a broadcasting station. However, stations were required to make reasonable, good faith judgments about the importance and interest of particular races. Based upon those judgments, licensees were to 'determine how much time should be made available for candidates in each race on either a paid or unpaid basis.' There was no requirement that such time be made available for specific 'uses' of a broadcasting station to which Section 315 'equal opportunities' would be applicable." (Footnotes omitted.) *Report and Order: Commission Policy in Enforcing Section 312 (a)(7) of the Communications Act,* 68 F. C. C. 2d 1079, 1087–1088 (1978) (1978 Report and Order).

Under the pre-1971 public interest requirement, compliance with which was necessary to assure license renewal, some time

had to be given to political issues, but an individual candidate could claim no personal right of access unless his opponent used the station and no distinction was drawn between federal, state, and local elections.[6] See *Farmers Educational & Cooperative Union* v. *WDAY, Inc.*, 360 U. S. 525, 534 (1959). By its terms, however, § 312 (a)(7) singles out legally qualified candidates for *federal* elective office and grants them a special right of access on an individual basis, violation of which carries the serious consequence of license revocation. The conclusion is inescapable that the statute did more than simply codify the pre-existing public interest standard.

## B

The legislative history confirms that § 312 (a)(7) created a right of access that enlarged the political broadcasting responsibilities of licensees. When the subject of campaign reform was taken up by Congress in 1971, three bills were introduced in the Senate—S. 1, S. 382, and S. 956. All three measures, while differing in approach, were "intended to increase a candidate's accessibility to the media and to reduce the level of spending for its use." Federal Election Campaign Act of 1971: Hearings on S. 1, S. 382, and S. 956 before the Subcommittee on Communications of the Senate Committee on Commerce, 92d Cong., 1st Sess., 2 (1971) (remarks of Sen. Pastore). The subsequent Report of the Senate Commerce Committee stated that one of the primary purposes of the Federal Election Campaign Act of 1971 was to "give candidates for public office *greater access to the media* so that they may better explain their stand on the issues, and thereby more fully and completely inform the voters." S. Rep. No. 92–96, p. 20 (1971) (emphasis added). The Report con-

---

[6] The public interest requirement still governs the obligations of broadcasters with respect to political races at the state and local levels. See *Public Notice: The Law of Political Broadcasting and Cablecasting*, 69 F. C. C. 2d 2209, 2290 (1978) (1978 Primer).

tained neither an explicit interpretation of the provision that became § 312 (a)(7) nor a discussion of its intended impact, but simply noted:

"[The amendment] provide[s] that willful or repeated failure by a broadcast licensee to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of his station's facilities by a lagally [*sic*] qualified candidate for Federal elective office on behalf of his candidacy shall be grounds for adverse action by the FCC.

"The duty of broadcast licensees generally to permit the use of their facilities by legally qualified candidates for these public offices is inherent in the requirement that licensees serve the needs and interests of the [communities] of license. The Federal Communications Commission has recognized this obligation . . . ." *Id.*, at 34.

While acknowledging the "general" public interest requirement, the Report treated it separately from the specific obligation prescribed by the proposed legislation. See also *id.*, at 28.

As initially reported in the Senate, § 312 (a)(7) applied broadly, to "the use of a broadcasting station by any person who is a legally qualified candidate on behalf of his candidacy." *Id.*, at 3. The Conference Committee confined the provision to candidates seeking *federal* elective office. S. Conf. Rep. No. 92–580, p. 22 (1971); H. Conf. Rep. No. 92–752, p. 22 (1971). During floor debate on the Conference Report in the House, attention was called to the substantial impact § 312 (a)(7) would have on the broadcasting industry:

"[B]roadcasters [are required] to permit any legally qualified candidate [for federal office] to purchase a 'reasonable amount of time' for his campaign advertising. Any broadcaster found in willful or repeated violation of this requirement could lose his license and be

thrown out of business, his total record of public service notwithstanding.

. . . . .

"[U]nder this provision, a broadcaster, whose license is obtained and retained on basis of performance in the public interest, may be charged with being unreasonable and, therefore, fall subject to revocation of his license." 118 Cong. Rec. 326 (1972) (remarks of Rep. Keith).

Such emphasis on the thrust of the statute would seem unnecessary if it did nothing more than reiterate the public interest standard.

Perhaps the most telling evidence of congressional intent, however, is the contemporaneous amendment of § 315 (a) of the Communications Act.[7] That amendment was described by the Conference Committee as a "conforming amendment" necessitated by the enactment of § 312 (a)(7). S. Conf. Rep. No. 92–580, *supra*, at 22; H. Conf. Rep. No. 92–752, *supra*, at 22. Prior to the "conforming amendment," the second sentence of 47 U. S. C. § 315 (a) (1970 ed.) read: "No obligation is imposed upon any licensee to allow the use of its station by any such candidate." This language made clear that broadcasters were not common carriers as to affirmative, rather than responsive, requests for access. As a result of the amendment, the second sentence now contains an important qualification: "No obligation is imposed *under this subsection* upon any licensee to allow the use of its station by any such candidate." 47 U. S. C. § 315 (a) (emphasis added). Congress retreated from its statement that "no obligation" exists to afford individual access presumably because § 312 (a)(7) compels such access in the context of federal elections. If § 312 (a)(7) simply reaffirmed the pre-existing public inter-

---

[7] Title 47 U. S. C. § 315 (a) provides that, if a legally qualified candidate for public office is permitted to use a broadcasting station, the licensee must afford "equal opportunities to all other . . . candidates for that office in the use of [the] station."

est requirement with the added sanction of license revocation, no conforming amendment to § 315 (a) would have been needed.

Thus, the legislative history supports the plain meaning of the statute that individual candidates for federal elective office have a right of reasonable access to the use of stations for paid political broadcasts on behalf of their candidacies,[8] without reference to whether an opponent has secured time.

## C

We have held that "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong, especially when Congress has refused to alter the administrative construction." *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 381 (1969) (footnotes omitted). Accord *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S. 94, 121 (1973). Such deference "is particularly appropriate where, as here, an agency's interpretation involves issues of considerable public controversy, and Congress has not acted to correct any misperception of its statutory objectives." *United States* v. *Rutherford,* 442 U. S. 544, 554 (1979).

Since the enactment of § 312 (a)(7), the Commission has consistently construed the statute as extending beyond the prior public interest policy. In 1972, the Commission made clear that § 312 (a)(7) "now imposes on the overall obligation to operate in the public interest *the additional specific requirement* that reasonable access and purchase of reasonable amounts of time be afforded candidates for Federal office." *Use of Broadcast and Cablecast Facilities by Candidates for Public Office,* 34 F. C. C. 2d 510, 537–538 (1972)

---

[8] No request for access must be honored under § 312 (a)(7) unless the candidate is willing to pay for the time sought. See *Kennedy for President Comm.* v. *FCC,* 204 U. S. App. D. C. 160, 174–178, 636 F. 2d 432, 446–450 (1980); 1978 Primer, at 2288.

(1972 Policy Statement) (emphasis added). Accord, *Public Notice Concerning Licensee Responsibility Under Amendments to the Communications Act Made by the Federal Election Campaign Act of 1971,* 47 F. C. C. 2d 516 (1974). In its 1978 Report and Order, the Commission stated:

> "When Congress enacted Section 312 (a)(7), it imposed an additional obligation on the general mandate to operate in the public interest. Licensees were specifically required to afford reasonable access to or to permit the purchase of reasonable amounts of broadcast time for the 'use' of Federal candidates.
>
> "We see no merit to the contention that Section 312 (a)(7) was meant merely as a codification of the Commission's already existing policy concerning political broadcasts. There was no reason to commit that policy to statute since it was already being enforced by the Commission. . . ." 68 F. C. C. 2d, at 1088.

See also 1978 Primer, 69 F. C. C. 2d, at 2286–2289. The Commission has adhered to this view of the statute in its rulings on individual inquiries and complaints. See, *e. g., The Labor Party,* 67 F. C. C. 2d 589, 590 (1978); *Ken Bauder,* 62 F. C. C. 2d 849 (Broadcast Bureau 1976); *Don C. Smith,* 49 F. C. C. 2d 678, 679 (Broadcast Bureau 1974); *Summa Corp.,* 43 F. C. C. 2d 602, 603–605 (1973); *Robert H. Hauslein,* 39 F. C. C. 2d 1064, 1065 (Broadcast Bureau 1973).

Congress has been made aware of the Commission's interpretation of § 312 (a)(7). In 1973, hearings were conducted to review the operation of the Federal Election Campaign Act of 1971. Federal Election Campaign Act of 1973: Hearings on S. 372 before the Subcommittee on Communications of the Senate Committee on Commerce, 93d Cong., 1st Sess. (1973). Commission Chairman Dean Burch testified regarding the agency's experience with § 312 (a)(7). *Id.,* at 136–137. He noted that the Commission's 1972 Policy Statement was "widely distributed and represented our best judgment as to

the requirements of the law and the intent of Congress." *Id.,* at 135. Chairman Burch discussed some of the difficult questions implicit in determining whether a station has afforded "reasonable access" to a candidate for federal office, and in conclusion stated: "We have brought our approach to these problems in the form of the 1972 Public Notice to the attention of Congress. If we have erred in some important construction, we would, of course, welcome congressional guidance." *Id.,* at 137. Senator Pastore, Chairman of the Communications Subcommittee, replied:

> "We didn't draw the provision any differently than we did because when you begin to legislate on guidelines, and on standards, and on criteria, you know what you run up against. I think what we did was reasonable enough, and I think what you did was reasonable enough as well.

> .     .     .     .     .

> "I would suppose that in cases of that kind, you would get some complaints. But, frankly, I think it has worked out pretty well." *Id.,* at 137–138.

The issue was joined when CBS Vice Chairman Frank Stanton also testified at the hearings and objected to the fact that § 312 (a)(7) "grants rights to all legally qualified candidates for Federal office . . . ." *Id.,* at 190. He strongly urged "repeal" of the statute, but his plea was unsuccessful. *Ibid.*[9]

The Commission's repeated construction of § 312 (a)(7) as affording an affirmative right of reasonable access to in-

---

[9] Broadcasters have continued to register their complaints about § 312 (a)(7) with Congress. See First Amendment Clarification Act of 1977: Hearing on S. 22 before the Subcommittee on Communications of the Senate Committee on Commerce, Science, and Transportation, 95th Cong., 2d Sess., 67 (1978). And Congress has considered specific proposals to repeal the statute, but has declined to do so. See S. 22, 95th Cong., 1st Sess., § 3 (1977); S. 1178, 94th Cong., 1st Sess., § 2 (1975). Indeed when the Federal Election Campaign Act was amended in 1974, § 312 (a)(7) was left undisturbed. See Pub. L. 93–443, 88 Stat. 1272.

dividual candidates for federal elective office comports with the statute's language and legislative history and has received congressional review. Therefore, departure from that construction is unwarranted. "Congress' failure to repeal or revise [the statute] in the face of such administrative interpretation [is] persuasive evidence that that interpretation is the one intended by Congress." *Zemel* v. *Rusk*, 381 U. S. 1, 11 (1965).

## D

In support of their narrow reading of § 312 (a)(7) as simply a restatement of the public interest obligation, petitioners cite our decision in *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S. 94 (1973), which held that neither the First Amendment nor the Communications Act requires broadcasters to accept paid editorial advertisements from citizens at large. The Court in *Democratic National Committee* observed that "the Commission on several occasions has ruled that no private individual or group has a right to command the use of broadcast facilities," and that Congress has not altered that policy even though it has amended the Communications Act several times. *Id.*, at 113. In a footnote, on which petitioners here rely, we referred to the then recently enacted § 312 (a)(7) as one such amendment, stating that it had "essentially codified the Commission's prior interpretation of § 315 (a) as requiring broadcasters to make time available to political candidates." *Id.*, at 113–114, n. 12.

However, "the language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter* v. *Sonotone Corp.*, 442 U. S., at 341. The qualified observation that § 312 (a)(7) "essentially codified" existing Commission practice was not a conclusion that the statute was in all respects coextensive with that practice and imposed no additional duties on broadcasters. In *Democratic National Committee*, we did not purport to rule on the precise con-

tours of the responsibilities created by § 312 (a)(7) since that issue was not before us. Like the general public interest standard and the equal opportunities provision of § 315 (a), § 312 (a)(7) reflects the importance attached to the use of the public airwaves by political candidates. Yet we now hold that § 312 (a)(7) expanded on those predecessor requirements and granted a new right of access to persons seeking election to federal office.[10]

## III

### A

Although Congress provided in § 312 (a)(7) for greater use of broadcasting stations by federal candidates, it did not give guidance on how the Commission should implement the statute's access requirement. Essentially, Congress adopted a "rule of reason" and charged the Commission with its enforcement. Pursuant to 47 U. S. C. § 303 (r), which empowers the Commission to "[m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of [the Communications Act]," the agency has developed standards to effectuate the guarantees of § 312 (a)(7). See also 47 U. S. C. § 154 (i). The Commission has issued some general interpretative statements, but its standards implementing § 312 (a)(7) have evolved principally on a case-by-case basis and are not embodied in formalized rules. The relevant criteria broadcasters must employ in evaluating access requests under the statute can be summarized from the Commission's 1978 Report and Order and the memorandum opinions and orders in these cases.

Broadcasters are free to deny the sale of air time prior to

---

[10] See generally Note, The Right of "Reasonable Access" for Federal Political Candidates Under Section 312 (a)(7) of the Communications Act, 78 Colum. L. Rev. 1287 (1978).

the commencement of a campaign, but once a campaign has begun, they must give reasonable and good-faith attention to access requests from "legally qualified" candidates [11] for federal elective office. Such requests must be considered on an individualized basis, and broadcasters are required to tailor their responses to accommodate, as much as reasonably possible, a candidate's stated purposes in seeking air time. In responding to access requests, however, broadcasters may also give weight to such factors as the amount of time previously sold to the candidate, the disruptive impact on regular programming, and the likelihood of requests for time by rival candidates under the equal opportunities provision of § 315 (a). These considerations may not be invoked as pretexts for denying access; to justify a negative response, broadcasters must cite a realistic danger of substantial program disruption—perhaps caused by insufficient notice to allow adjustments in the schedule—or of an excessive number of equal time requests. Further, in order to facilitate review by the Commission, broadcasters must explain their reasons for refusing time or making a more limited counteroffer. If broadcasters take the appropriate factors into account and act reasonably and in good faith, their decisions will be entitled to deference even if the Commission's analysis would have differed in the first instance. But if broadcasters adopt "across-the-board policies" and do not attempt to respond to

---

[11] In order to be "legally qualified" under the Commission's rules, a candidate must: (a) be eligible under law to hold the office he seeks; (b) announce his candidacy; and (c) qualify for a place on the ballot or be eligible under law for election as a write-in candidate. Persons seeking nomination for the Presidency or Vice Presidency are "legally qualified" in: (a) those states in which they or their proposed delegates have qualified for the primary or Presidential preference ballot; or (b) those states in which they have made a substantial showing of being serious candidates for nomination. Such persons will be considered "legally qualified" in all states if they have qualified in 10 or more states. See 1978 Primer, 69 F. C. C. 2d, at 2216–2218.

the individualized situation of a particular candidate, the Commission is not compelled to sustain their denial of access. See 74 F. C. C. 2d, at 665–674; 74 F. C. C. 2d, at 642–651; 1978 Report and Order, 68 F. C. C. 2d, at 1089–1092, 1094. Petitioners argue that certain of these standards are contrary to the statutory objectives of § 312 (a)(7).

## (1)

The Commission has concluded that, as a threshold matter, it will independently determine whether a campaign has begun and the obligations imposed by § 312 (a)(7) have attached. 74 F. C. C. 2d, at 665–666. Petitioners assert that, in undertaking such a task, the Commission becomes improperly involved in the electoral process and seriously impairs broadcaster discretion.

However, petitioners fail to recognize that the Commission does not set the starting date for a campaign. Rather, on review of a complaint alleging denial of "reasonable access," it examines objective evidence to find whether the campaign has already commenced, "taking into account the position of the candidate *and the networks* as well as other factors." *Id.*, at 665 (emphasis added). As the Court of Appeals noted, the "determination of when the statutory obligations attach does not control the electoral process, . . . the determination is controlled by the process." 202 U. S. App. D. C., at 384, 629 F. 2d, at 16. Such a decision is not, and cannot be, purely one of editorial judgment.

Moreover, the Commission's approach serves to narrow § 312 (a)(7), which might be read as vesting access rights in an individual candidate as soon as he becomes "legally qualified" without regard to the status of the campaign. See n. 11, *supra.* By confining the applicability of the statute to the period after a campaign commences, the Commission has limited its impact on broadcasters and given substance to its command of *reasonable* access.

(2)

Petitioners also challenge the Commission's requirement that broadcasters evaluate and respond to access requests on an individualized basis. In petitioners' view, the agency has attached inordinate significance to candidates' needs, thereby precluding fair assessment of broadcasters' concerns and prohibiting the adoption of uniform policies regarding requests for access.

While admonishing broadcasters not to " 'second guess' the 'political' wisdom or . . . effectiveness" of the particular format sought by a candidate, the Commission has clearly acknowledged that "the candidate's . . . request is by no means conclusive of the question of how much time, if any, is appropriate. Other . . . factors, such as the disruption or displacement of regular programming (particularly as affected by a reasonable probability of requests by other candidates), must be considered in the balance." 74 F. C. C. 2d, at 667–668. Thus, the Commission mandates careful consideration of, not blind assent to, candidates' desires for air time.

Petitioners are correct that the Commission's standards proscribe blanket rules concerning access; each request must be examined on its own merits. While the adoption of uniform policies might well prove more convenient for broadcasters, such an approach would allow personal campaign strategies and the exigencies of the political process to be ignored. A broadcaster's "evenhanded" response of granting only time spots of a fixed duration to candidates may be "unreasonable" where a particular candidate desires less time for an advertisement or a longer format to discuss substantive issues. In essence, petitioners seek the unilateral right to determine in advance how much time to afford *all* candidates. Yet § 312 (a)(7) assures a right of reasonable access to *individual* candidates for federal elective office, and the Commission's requirement that their requests be considered on an *individualized* basis is consistent with that guarantee.

## (3)

The Federal Communications Commission is the experienced administrative agency long entrusted by Congress with the regulation of broadcasting, and the Commission is responsible for implementing and enforcing § 312 (a)(7) of the Communications Act. Accordingly, its construction of the statute is entitled to judicial deference "unless there are compelling indications that it is wrong." *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S., at 381. As we held in *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S., at 120, the Commission must be allowed to "remain in a posture of flexibility to chart a workable 'middle course' in its quest to preserve a balance between the essential public accountability and the desired private control of the media." Like the Court of Appeals, we cannot say that the Commission's standards are arbitrary and capricious or at odds with the language and purposes of § 312 (a)(7). See 5 U. S. C. § 706 (2)(A). Indeed, we are satisfied that the Commission's action represents a reasoned attempt to effectuate the statute's access requirement, giving broadcasters room to exercise their discretion but demanding that they act in good faith.[12]

## B

There can be no doubt that the Commission's standards have achieved greater clarity as a result of the orders in these cases.[13] However laudable that may be, it raises the question

---

[12] The dissenters place great emphasis on the preservation of broadcaster discretion. However, endowing licensees with a "blank check" to determine what constitutes "reasonable access" would eviscerate § 312 (a)(7).

[13] In 1978, the Commission issued a Notice of Inquiry, which asked whether rulemaking proceedings should be commenced in order to clarify licensee obligations under § 312 (a)(7). 43 Fed. Reg. 12938. Petitioners and others in the broadcasting industry expressed strong opposition to the promulgation of specific rules, and none were formulated. 1978 Report and Order, 68 F. C. C. 2d, at 1079–1081. Petitioners, therefore, must share responsibility for any vagueness and confusion in the Commission's standards.

whether § 312 (a)(7) was properly applied to petitioners.[14] Based upon the Commission's prior decisions and 1978 Report and Order, however, we must conclude that petitioners had adequate notice that their conduct in responding to the Carter-Mondale Presidential Committee's request for access would contravene the statute.

In the 1978 Report and Order, the Commission stated that it could not establish a precise point at which § 312 (a)(7) obligations would attach for all campaigns because each is unique:

"For instance, *a presidential campaign may be in full swing almost a year before an election;* other campaigns may be limited to a short concentrated period. . . . [W]e believe that, generally, a licensee would be unreasonable if it refused to afford access to Federal candidates at least during those time periods [when the 'lowest unit charge' provision of § 315 applied]. Moreover, it may be required to afford reasonable access before these periods; however, the determination of whether 'reasonable access' must be afforded before these periods for particular races must be made in each case under all the facts and circumstances present. . . . [W]e expect licensees to afford access at a reasonable time prior to a convention or caucus. We will review a licensee's decisions in

---

[14] Section 312 (a) empowers the Commission to "revoke any *station* license or construction permit." (Emphasis added.) In the Court of Appeals, petitioners argued that the statute applies only to licensees, not to networks. However, the court rejected that contention, reasoning that the Commission's jurisdiction to "mandate reasonable network access . . . is 'reasonably ancillary' to the effective enforcement of the individual licensee's Section 312 (a)(7) obligations . . . ." 202 U. S. App. D. C., at 393–395, 629 F. 2d, at 25–27. Petitioners do not contest that holding in this Court. See Tr. of Oral Arg. 16–17. In any event, as the Commission noted, each petitioner is "a multi-station licensee fully reachable [as to its licenses] by [the express] revocation authority" granted under § 312 (a)(7). 74 F. C. C. 2d, at 640, n. 10.

this area on a case-by-case basis." 68 F. C. C. 2d, at 1091–1092 (emphasis added).

In *Anthony R. Martin-Trigona,* 67 F. C. C. 2d 743 (1978), the Commission observed: "[T]he licensee, *and ultimately the Commission,* must look to the circumstances of each particular case to determine when it is reasonable for a candidate's access to begin . . . ." *Id.,* at 746, n. 4 (emphasis added). Further, the 1978 Report and Order made clear that "Federal candidates are the intended beneficiary of Section 312 (a)(7) and therefore a candidate's desires as to the method of conducting his or her media campaign should be considered by licensees in granting reasonable access." 68 F. C. C. 2d, at 1089, n. 14. The agency also stated:

"[A]n arbitrary 'blanket' ban on the use by a candidate of a particular class or length of time in a particular period cannot be considered reasonable. A Federal candidate's decisions as to the best method of pursuing his or her media campaign should be honored as much as possible under the 'reasonable' limits imposed by the licensee." *Id.,* at 1090.

Here, the Carter-Mondale Presidential Committee sought broadcast time approximately 11 months before the 1980 Presidential election and 8 months before the Democratic National Convention. In determining that a national campaign was underway at that point, the Commission stressed: (a) that 10 candidates formally had announced their intention to seek the Republican nomination, and 2 candidates had done so for the Democratic nomination; (b) that various states had started the delegate selection process; (c) that candidates were traveling across the country making speeches and attempting to raise funds; (d) that national campaign organizations were established and operating; (e) that the Iowa caucus would be held the following month; (f) that public officials and private groups were making endorsements; and (g) that the national print media had given cam-

paign activities prominent coverage for almost two months. 74 F. C. C. 2d, at 645–647. The Commission's conclusion about the status of the campaign accorded with its announced position on the vesting of § 312 (a)(7) rights and was adequately supported by the objective factors on which it relied.

Nevertheless, petitioners ABC and NBC refused to sell the Carter-Mondale Presidential Committee any time in December 1979 on the ground that it was "too early in the political season." App. 41–43, 52–74; nn. 3 and 4, *supra*. These petitioners made no counteroffers, but adopted "blanket" policies refusing access despite the admonition against such an approach in the 1978 Report and Order. Cf. *Donald W. Riegle*, 59 F. C. C. 2d 1314 (1976); *WALB–TV, Inc.*, 59 F. C. C. 2d 1246 (1976). Likewise, petitioner CBS, while not barring access completely, had an across-the-board policy of selling only 5-minute spots to all candidates, notwithstanding the Commission's directive in the 1978 Report and Order that broadcasters consider "a candidate's desires as to the method of conducting his or her media campaign." 68 F. C. C. 2d, at 1089, n. 14. See App. 44–45, 75–93; n. 2, *supra*. Petitioner CBS responded with its standard offer of separate 5-minute segments, even though the Carter-Mondale Presidential Committee sought 30 minutes of air time to present a comprehensive statement launching President Carter's re-election campaign. Moreover, the Committee's request was made almost two months before the intended date of broadcast, was flexible in that it could be satisfied with any prime time slot during a 4-day period, was accompanied by an offer to pay the normal commercial rate, and was not preceded by other requests from President Carter for access. See App. 27–40; n. 1, *supra*. Although petitioners adverted to the disruption of regular programming and the potential equal time requests from rival candidates in their responses to the Carter-Mondale Presidential Committee's complaint, the Commission rejected these claims as "speculative and unsubstantiated at best." 74 F. C. C. 2d, at 674.

Under these circumstances, we cannot conclude that the Commission abused its discretion in finding that petitioners failed to grant the "reasonable access" required by § 312 (a) (7).[15] See 5 U. S. C. § 706 (2)(A). "[T]he fact that we might not have made the same determination on the same facts does not warrant a substitution of judicial for administrative discretion since Congress has confided the problem to the latter." *FCC* v. *WOKO, Inc.,* 329 U. S. 223, 229 (1946). "[C]ourts should not overrule an administrative decision merely because they disagree with its wisdom." *Radio Corp. of America* v. *United States,* 341 U. S. 412, 420 (1951).

## IV

Finally, petitioners assert that § 312 (a)(7) as implemented by the Commission violates the First Amendment rights of broadcasters by unduly circumscribing their editorial discretion. In *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S., at 117, we stated:

> "Th[e] role of the Government as an 'overseer' and ultimate arbiter and guardian of the public interest and the role of the licensee as a journalistic 'free agent' call for a delicate balancing of competing interests. The maintenance of this balance for more than 40 years has called on both the regulators and the licensees to walk a 'tightrope' to preserve the First Amendment values written

---

[15] As it did here, the Commission, with the approval of broadcasters, engages in case-by-case adjudication of § 312 (a)(7) complaints rather than awaiting license renewal proceedings. See Tr. of Oral Arg. 11–16. Although the penalty provided by § 312 (a)(7) is license revocation, petitioners simply were directed to inform the Commission of how they intended to meet their statutory obligations. See 74 F. C. C. 2d, at 651; 74 F. C. C. 2d, at 676–677. In essence, the Commission entered a declaratory order that petitioners' responses to the Carter-Mondale Presidential Committee constituted a denial of "reasonable access." Such a ruling favors broadcasters by allowing an opportunity for curative action before their conduct is found to be "willful or repeated" and subject to the imposition of sanctions.

into the Radio Act and its successor, the Communications Act."

Petitioners argue that the Commission's interpretation of § 312 (a)(7)'s access requirement disrupts the "delicate balanc[e]" that broadcast regulation must achieve. We disagree.

A licensed broadcaster is "granted the free and exclusive use of a limited and valuable part of the public domain; when he accepts that franchise it is burdened by enforceable public obligations." *Office of Communication of the United Church of Christ* v. *FCC*, 123 U. S. App. D. C. 328, 337, 359 F. 2d 994, 1003 (1966). This Court has noted the limits on a broadcast license:

> "A license permits broadcasting, but the licensee has no constitutional right to be the one who holds the license or to monopolize a . . . frequency to the exclusion of his fellow citizens. There is nothing in the First Amendment which prevents the Government from requiring a licensee to share his frequency with others . . . ." *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S., at 389.

See also *FCC* v. *National Citizens Comm. for Broadcasting*, 436 U. S. 775, 799–800 (1978). Although the broadcasting industry is entitled under the First Amendment to exercise "the widest journalistic freedom consistent with its public [duties]," *Columbia Broadcasting System, Inc.* v. *Democratic National Committee, supra,* at 110, the Court has made clear that:

> "*It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount.* It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market . . . . It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here." *Red*

*Lion Broadcasting Co.* v. *FCC, supra,* at 390 (citations omitted) (emphasis added).

The First Amendment interests of candidates and voters, as well as broadcasters, are implicated by § 312 (a)(7). We have recognized that "it is of particular importance that candidates have the . . . opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day." *Buckley* v. *Valeo,* 424 U. S. 1, 52–53 (1976). Indeed, "speech concerning public affairs is . . . the essence of self-government," *Garrison* v. *Louisiana,* 379 U. S. 64, 74–75 (1964). The First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co.* v. *Roy,* 401 U. S. 265, 272 (1971). Section 312 (a)(7) thus makes a significant contribution to freedom of expression by enhancing the ability of candidates to present, and the public to receive, information necessary for the effective operation of the democratic process.

Petitioners are correct that the Court has never approved a *general* right of access to the media. See, *e. g., FCC* v. *Midwest Video Corp.,* 440 U. S. 689 (1979); *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974); *Columbia Broadcasting System, Inc.* v. *Democratic National Committee, supra.* Nor do we do so today. Section 312 (a)(7) creates a *limited* right to "reasonable" access that pertains only to legally qualified federal candidates and may be invoked by them only for the purpose of advancing their candidacies once a campaign has commenced. The Commission has stated that, in enforcing the statute, it will "provide leeway to broadcasters and not merely attempt *de novo* to determine the reasonableness of their judgments . . . ." 74 F. C. C. 2d, at 672. If broadcasters have considered the relevant factors in good faith, the Commission will uphold their decisions. See 202 U. S. App. D. C., at 393, 629 F. 2d, at 25. Further, § 312

(a)(7) does not impair the discretion of broadcasters to present their views on any issue or to carry any particular type of programming.

Section 312 (a)(7) represents an effort by Congress to assure that an important resource—the airwaves—will be used in the public interest. We hold that the statutory right of access, as defined by the Commission and applied in these cases, properly balances the First Amendment rights of federal candidates, the public, and broadcasters.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE WHITE, with whom JUSTICE REHNQUIST and JUSTICE STEVENS join, dissenting.

The Court's opinion is disarmingly simple and seemingly straightforward: in 1972, Congress created a right of reasonable access for candidates for federal office; the Federal Communications Commission, charged with enforcing the statute, has defined that right; as long as the agency's action is within the zone of reasonableness, it should be accepted even though a court would have preferred a different course. This approach, however, conceals the fundamental issue in these cases, which is whether Congress intended not only to create a right of reasonable access but also to negate the longstanding statutory policy of deferring to editorial judgments that are not destructive of the goals of the Act. In these cases such a policy would require acceptance of network or station decisions on access as long as they are within the range of reasonableness, even if the Commission would have preferred different responses by the networks. It is demonstrable that Congress did not intend to set aside this traditional policy, and the Commission seriously misconstrued the statute when it assumed that it had been given authority to insist on its own views as to reasonable access even though this entailed rejection of media judgments representing different but nevertheless reasonable reactions to access requests. As this litiga-

tion demonstrates, the result is an administratively created right of access which, in light of the pre-existing statutory policies concerning access, is far broader than Congress could have intended to allow. The Court unfortunately accepts this major departure from the underlying themes of the Communications Act and from the cases that have construed that statute. With all due respect, I dissent.

Section 312 (a)(7) provides that the Commission may revoke a broadcast license "for willful or repeated failure to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy." It is untenable to suggest that the right of access the Commission has created is required or even suggested by the plain language of this section. What is "reasonable" access and what are "reasonable" amounts of time that must be sold are matters about which fair minds could easily differ. The Commission recognized as much in this litigation: "The statutory language," it said, "does not expressly define the scope of the Commission's responsibilities or the procedures by which it should enforce them." 74 F. C. C. 2d 631, 637. Furthermore, the Commission thought "[t]he legislative history of Section 312 (a)(7) does little to clarify those responsibilities and procedures." *Ibid.* It also found the floor debates to be "equally uninstructive." *Ibid.* It then announced that "[i]n the absence of further direction, we must also assume that Congress wanted to delegate to the Commission broad responsibility to define and implement the scope of Section 312 (a)(7)'s rights and duties." *Id.,* at 638. Having conferred *carte blanche* on themselves, four of the seven members of the Commission proceeded to produce some 48 printed pages of guidelines, proscriptions, prescriptions, permissions, instructions on balancing, clarifications, summaries, conclusions, and orders, all purporting to define the "reasonable" access that broadcasters must provide federal candidates for office and to explain why the networks'

offers of access were not reasonable under the circumstances. The Commission issued an initial opinion covering 24 pages but felt compelled to write 24 more pages on reconsideration, purporting to clarify and explain what it had meant in the first place. I think the Commission fell into serious error and that its action was arbitrary, capricious, an abuse of discretion, and otherwise contrary to law. 5 U. S. C. § 706 (2)(A). At the very least, its decision represents "a clear error of judgment." *Citizens to Preserve Overton Park, Inc.* v. *Volpe,* 401 U. S. 402, 416 (1971). I regret particularly that the Court of Appeals and this Court have compounded the error by suggesting that the Commission understood its task and competently performed it in an understandable manner. There are several reasons for my position.

1. The Commission seemed to approach this case as though Congress were legislating on a clean slate, without regard for other provisions of the Act and the manner in which those provisions had been construed and applied to avoid undue intrusions upon the editorial judgment of broadcasters and without regard for the longstanding statutory policies about access, including the recognized duty imposed on broadcasters to serve the public interest by keeping the citizenry reasonably informed about political candidates.

The history of the Federal Government's regulation of the broadcast media has been recounted by this Court on several occasions. See *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 103–110 (1973); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 375–386 (1969). That history evinces Congress' efforts to deal with the inevitable tension between the need to allocate scarce frequencies and the importance of giving licensees broad discretion in exercising editorial judgment in the use of those frequencies. These efforts have led to the creation of a general requirement that broadcast licensees operate in the public interest but that they be given considerable leeway in the fulfillment of that duty. As the Court stated in *Columbia*

*Broadcasting System, Inc.* v. *Democratic National Committee, supra,* at 110: "Congress intended to permit private broadcasting to develop with the widest journalistic freedom consistent with its public obligation. Only when the interests of the public are found to outweigh the private journalistic interests of the broadcasters will government power be asserted within the framework of the Act." In particular, Congress has explicitly provided that broadcast licensees are not common carriers, 47 U. S. C. § 153 (h), and that the Commission may not engage in censorship of radio communications. 47 U. S. C. § 326.

The parties agree that prior to the adoption of § 312 (a)(7) individuals or organizations had no specific right of access to broadcast facilities. This was the common view of the Commission, the courts, and Congress. As we said in *Columbia Broadcasting System, Inc.* v. *Democratic National Committee, supra,* at 122, Congress had "time and again rejected various legislative attempts that would have mandated a variety of forms of individual access." Broadcasters had obligations with respect to their programming, such as the fairness doctrine which obligated them to cover issues of public importance from opposing points of view, but this obligation was enforced with care so as not to unduly infringe on the "journalistic discretion in deciding how best to fulfill the Fairness Doctrine obligations." 412 U. S., at 111. We also observed: "[I]n the area of discussion of public issues Congress chose to leave broad journalistic discretion with the licensee. Congress specifically dealt with—and firmly rejected—the argument that the broadcast facilities should be open on a nonselective basis to all persons wishing to talk about public issues." *Id.,* at 105. Similarly, in *FCC* v. *Midwest Video Corp.,* 440 U. S. 689 (1979), where we held that the Commission had erred in providing for a general system of access to cable television, we noted that the Commission's authority with respect to cable television was derived from the provisions of the Communications Act and

concluded that the Commission should not have ignored "Congress' stern disapproval—evidenced in § 3 (h)—of negation of the editorial discretion otherwise enjoyed by broadcasters and cable operators alike." *Id.,* at 708. We reaffirmed "the policy of the Act to preserve editorial control of programming in the licensee." *Id.,* at 705.

Broadcasters, however, had certain statutory obligations with respect to political broadcasting: As the Commission has explained, it had "recognized political broadcasting as one of the fourteen basic elements necessary to meet the public interest, needs and desires of the community." *Report and Order: Commission Policy in Enforcing Section 312 (a)(7) of the Communications Act,* 68 F. C. C. 2d 1079, 1087–1088 (1978). Prior to the enactment of § 312 (a)(7):

> "No legally qualified candidate had, at that time, a specific right of access to a broadcasting station. However, stations were required to make reasonable, good-faith judgments about the importance and interests of particular races. Based upon those judgments, licensees were to 'determine how much time should be made available for candidates in each race on either a paid or unpaid basis.' There was no requirement that such time be made available for specific 'uses' of a broadcasting station to which Section 315 'equal opportunities' would be applicable." 68 F. C. C. 2d, at 1088.

The Communications Act had thus long been construed to impose upon the broadcasters a duty to satisfy the public need for information about political campaigns. As this Court observed in *Farmers Educational & Cooperative Union* v. *WDAY, Inc.,* 360 U. S. 525, 534 (1959), a broadcaster policy of "denying all candidates use of stations . . . would . . . effectively withdraw political discussion from the air," and such result would be quite contrary to congressional intent. Furthermore, § 315 had long provided that should a station permit a political candidate to use its broadcasting facilities, it must "afford equal opportunities to all other such candi-

dates for that office . . . ." As that section expressly pro-
vided, however, the provision for equal time created no right
of initial access.

It is therefore as clear as can be that the regulation of the
broadcast media has been and is marked by a clearly defined
"legislative desire to preserve values of private journalism."
*Columbia Broadcasting System, Inc.* v. *Democratic National
Committee, supra,* at 109. The corollary legislative policy
has been not to recognize or attempt to require individual
rights of access to the broadcast media. These policies have
been so clear and are so obviously grounded in constitutional
considerations that in the absence of unequivocal legislative
intent to the contrary, it should not be assumed that § 312
(a)(7) was designed to make the kind of substantial inroads
in these basic considerations that the Commission has now
mandated. Section 312 (a)(7) undoubtedly changed the law
governing access in some respects, but the language of the sec-
tion, as the Commission itself concedes, does not require the
access rights the Commission has now created; and the legis-
lative history, far from supporting the Commission's actions
in these cases, has a contrary thrust.

2. The legislative history, most of which the Commission
ignored, shows that Congress was well aware of the statutory
and regulatory background recounted above. It also shows
that Congress had no intention of working the radical change
in the roles of the broadcaster and the Commission that the
Commission now insists is consistent with the statutory
mandate.

The initial effort to incorporate the "reasonable access"
concept into the Communications Act arose in 1970 as part
of a floor amendment to S. 3637, a bill designed to repeal the
equal time provisions of the Act with respect to Presidential
and Vice Presidential elections and to require the sale of
broadcast time to be made at the "lowest unit charge" avail-
able to commercial advertisers. S. 3637, 91st Cong., 2d Sess.
(1970). The amendment provided that "consistent with the
other needs of the community broadcast licensees shall make

a reasonable amount of time available for legally qualified candidates for federal elective offices during [prime time]." It also limited expenditures by candidates on broadcast time. 116 Cong. Rec. 11593 (1970). Senator Pastore, sponsor of the amendment, explained that its purpose was "to avoid any misunderstanding as to the obligation of the licensee in making time available to candidates for a Federal elective office." *Ibid.* The amendment was adopted by the Senate, but not by the House. However, the House Committee Report made clear that "[t]he presentation of legally qualified candidates for public office is an essential part of any broadcast licensee's obligation to serve the public interest." H. R. Rep. No. 91–1347, p. 7 (1970). Senator Pastore's amendment would have codified that obligation with respect to federal elective office. The final bill was vetoed by President Nixon.

A second effort, this time by Senator Scott, to codify a "reasonable access" provision arose in the next session of Congress. That provision would have directed the Commission to promulgate regulations that would "insure that all licensees make available to legally qualified candidates for public office reasonable amounts of time for use of broadcasting stations." S. 956, 92d Cong., 2d Sess., § 302 (c) (1971). The then Chairman of the Commission testified that he understood this proposal to codify the existing obligation of broadcasters to present political broadcasts under the public interest standard. Federal Election Campaign Act of 1971: Hearings on S. 1, S. 382, and S. 956 before the Subcommittee on Communications of the Senate Committee on Commerce, 92d Cong., 1st Sess., 189 (1971). This proposal also was not enacted.

The third effort to codify a reasonable access standard met with success in the form of § 312 (a)(7) which the Senate Committee on Commerce added to Title I of what ultimately became the Federal Election Campaign Act of 1971. S. 382, 92d Cong., 1st Sess. (1971). The portions of this bill that addressed broadcast media included a repeal of the equal time provision of the Communications Act with respect to Presi-

dential and Vice Presidential elections, a requirement that broadcasters charge political candidates a "lowest unit charge" during certain periods of a campaign, and limitations on expenditures by candidates for federal office.[1]  The Senate Committee indicated that these provisions should not result in the "diminution in the extent of such programming."  S. Rep. No. 92–96, p. 28 (1971).  And in this precise regard, § 312 (a)(7) was included in the bill "[i]n order to emphasize the public interest obligation inherent in making broadcast time available to candidates covered by the spending limitation in the legislation . . . ."  *Ibid.*  Section 312 (a)(7) was primarily a device to insure that other provisions of the bill would not dilute the pre-existing public interest standard as applied to federal elections.  Consistent with this approach, the Committee described the section and observed that

> "[t]he duty of broadcast licensees generally to permit the use of their facilities by legally qualified candidates for these public offices is inherent in the requirement that licensees serve the needs and interests of the [communities] of license."  *Id.,* at 34.

The legislative history thus reveals that Congress sought to codify what it conceived to be the pre-existing duty of the broadcasters to serve the public interest by presenting political broadcasts.  It also negates any suggestion that Congress believed it was creating the extensive, inflexible duty to provide access that the Commission has now fastened upon the broadcasters.  This is not to say that § 312 (a)(7) did not work important changes in the law, for it did put teeth in the obligation of the broadcasters' duty to serve the public interest by providing the remedy of license revocation for willful or repeated refusals to provide a candidate for federal elec-

---

[1] The bill as enacted did not include the proposed repeal of the equal time provisions with respect to Presidential and Vice Presidential elections.  86 Stat. 3.  In addition, the expenditure limitations of the Federal Election Campaign Act of 1971 have been repealed.  88 Stat. 1278.

tive office with reasonable access to broadcast time. The need for this remedy arose out of the concern that other provisions of the Federal Election Campaign Act could lead to a misunderstanding regarding the broadcasters' continuing duty to afford reasonable access to federal candidates.

The Commission almost totally ignored the legislative history as a possible limitation on the reach of the broadcasters' duty to provide reasonable access or upon the scope of its oversight responsibilities. The Commission did note that one of the purposes of the 1971 Act had been described as affording candidates a greater access to the broadcast media. But none of these statements indicated that this was the purpose of § 312 (a)(7), the provision at issue here. That purpose was served by other provisions of the amendments, such as the provision requiring the sale of broadcast time at the lowest unit charged during specified periods; § 312 (a)(7) itself aimed at preventing the charge limitation from reducing access that might otherwise be available.[2]

The Commission also noted, and the Court now heavily relies on, the so-called conforming amendment to § 315 (a), the equal time provision, which then provided that "[n]o obligation is imposed upon any licensee to allow the use of its station by any such candidate." 47 U. S. C. § 315 (a) (1970 ed.). But in its original form, 48 Stat. 1088, this portion of § 315 had provided that "no obligation is hereby imposed"— the word "hereby" being omitted by the codifier of Title 47 of the United States Code. To the extent that § 315 without

[2] One of the major purposes of the Federal Election Campaign Act was to shorten the length of campaigns, thereby reducing campaign costs. See S. Rep. No. 92–96, pp. 20–21, 28 (1971). Television advertising was described as "unquestionably the most used media in political campaigns, and it has been the most significant contributor to the spiraling cost of these campaigns." Id., at 30. The majority's interpretation of § 312 (a)(7) runs directly contrary to this broad goal. This decision is nothing more than an open invitation to start campaigning early, thus increasing the overall length of the campaign and the overall costs to all the candidates.

the conforming amendment, which returned the relevant provision to approximately its original form, suggested that the Act in no way required access to political candidates, it also called into the question the Commission's public interest policy of requiring stations to give reasonable access to political candidates. That the conforming amendment was made is understandable, but the Court gives it undue significance.

In any event, the Court relies on the conforming amendment for no more than an affirmative indication that Congress intended to give individual candidates a right of reasonable access, a right that did not exist prior to the enactment of § 312 (a)(7). This much may be conceded, but nothing in this bit of legislative history, or in any other, furnishes any support for the Commission's sweeping decision in these cases. On the contrary, the legislative history negates the Commission's conclusion that it was free to so drastically limit the discretion of the broadcasters and to so radically expand its own oversight authority.

3. The Court relies, as it must, on the authority of the Commission to interpret and apply the statute and on the deference that courts should accord to agency views with respect to the legislation it is charged with enforcing. As the Court has said, however, "[t]he amount of deference due an administrative agency's interpretation of a statute . . . 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " *St. Martin Evangelical Lutheran Church* v. *South Dakota,* 451 U. S. 772, 783, n. 13 (1981), quoting *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140 (1944). I find the Commission's current radical version not only quite inconsistent with its prior views but also singularly unpersuasive.

As for its past views, the Commission's policy statement issued in 1972, shortly after the enactment of the Federal Election Campaign Act, expressed the view that the section

had expressly imposed on the public interest obligation of broadcasters the "additional" specific requirement that candidates for federal public office be afforded reasonable access to broadcast time, but it also clearly eschewed anything approaching the negation of broadcaster discretion and the extensive agency oversight that the Commission's present decision inevitably involves:

"3. Q. How is a licensee to comply with the requirement of section 312 (a)(7) that he give reasonable access to his station to, or permit the purchase of reasonable amounts of time by, candidates for Federal elective office?

"A. Each licensee, under the provisions of sections 307 and 309 of the Communications Act, is required to serve the public interest, convenience, or necessity. In its *Report and Statement of Policy Re: Commission En Banc Programming Inquiry (1960)*, the Commission stated that political broadcasts constitute one of the major elements in meeting that standard. (See *Farmers Educational and Cooperative Union of America, North Dakota Division* v. *WDAY, Inc.*, 360 U. S. 525 (1959), and *Red Lion Broadcasting Co., Inc.* v. *FCC*, 395 U. S. 367, 393–394 (1969).) The foregoing broad standard has been applied over the years to the overall programming of licensees. New section 312 (a)(7) adds to that broad standard specific language concerning reasonable access.

". . . The test of whether a licensee has met the requirement of the new section is one of reasonableness. The Commission will not substitute its judgment for that of the licensee, but, rather, it will determine in any case that may arise whether the licensee can be said to have acted reasonably and in good faith in fulfilling his obligations under this section.

. . . . .

"8. Q. Some stations have in the past had the policy

of not selling short political spot announcements (*e. g.,* 10 seconds, 1 minute) on the ground that they did not contribute to an informed electorate. In light of the enactment of section 312 (a)(7), may stations have such policies, or must they sell reasonable numbers of short spots to legally qualified candidates for Federal office if requested?

"A. We have, prior to the enactment of section 312 (a)(7), when stations were (under the provisions of section 315) not required to allow use of their facilities by particular candidates for public office, ruled that licensees may have such policies. In so ruling, we have cautioned that licensees have the public interest consideration of making their facilities available to candidates, but have left to the good-faith judgment of the licensee the determination of how the facilities were to be used to serve the public interest. As complaints arose, we looked to the reasonableness of that judgment in a particular fact pattern. (31 F. C. C. 2d 782) (1971)). Section 312 (a) (7) now imposes on the overall obligation to operate in the public interest the additional specific requirement that reasonable access and purchase of reasonable amounts of time be afforded candidates for Federal office. *We shall, under this new section, apply the same test of reasonableness of the judgment of the licensee.*" *Use of Broadcast and Cablecast Facilities by Candidates for Public Office,* 34 F. C. C. 2d 510, 536–538 (emphasis supplied).

There was no suggestion in 1972 that the "needs" of the requesting candidate shall be paramount. Indeed, the Commission embraced its prior practice. Discretion was thought to remain with the broadcaster, not to be placed in the hands of the candidates or subjected to close and exacting oversight by the Commission. Clearly, the Commission's contemporaneous construction of § 312 (a)(7) is inconsistent with the sweeping construction of the section it has now adopted. See *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965).

Subsequent interpretations of the scope of § 312 (a)(7), including the comprehensive *Report and Order: Commission Policy in Enforcing Section 312 (a)(7) of the Communications Act,* 68 F. C. C. 2d 1079 (1978), have consistently refrained from curtailing broadcaster discretion by refusing to impose stringent standards or to second-guess the broadcaster's good-faith judgments. In the *Report and Order,* the Commission explained:

> "Since the passage of Section 312 (a)(7) as part of the Federal Election Campaign Act of 1971, the Commission's policy has generally been to defer to the reasonable, good faith judgment of licensees as to what constitutes 'reasonable access' under all the circumstances present in a particular case. The Commission desired, through its inquiry into this area, to learn whether that policy was proving manageable and equitable for candidates and licensees or whether additional rules or guidelines would be advisable." *Id.,* at 1079–1080.

After a detailed examination of the question, the Commission concluded:

> "We continue to believe that the best method for achieving a balance between the desires of candidates for air time and the commitments of licensees to the broadcast of other types of programming is to rely on the reasonable, good faith discretion of individual licensees. We are convinced that there are no formalized rules which would encompass all the various circumstances possible during an election campaign." *Id.,* at 1089.

The Commission went on to suggest some very broad guidelines it considered essential in effectuating the intent of Congress under § 312 (a)(7). For example, candidates generally were to be afforded some access to prime time, and access was to be flexible, including the possibility of program time and "spot" announcements. Candidates were not entitled, however, "to a particular placement of his or her political an-

nouncement on a station's broadcast schedule. . . . It is best left to the discretion of a licensee when and on what date a candidate's spot announcement or program should be aired" 68 F. C. C. 2d, at 1091. The Commission specifically refused to arrogate to itself the power to determine when the reasonable access duty attached except on a case-by-case basis leaving the initial judgment in the hands of the broadcast licensee. Finally, there is no statement in this report that requires broadcasters to look to the needs of a candidate in the initial determination of reasonable access other than the admonition that broadcasters could not "follow a policy of flatly banning access by a Federal candidate to any of the classes and lengths of program or spot time in the same periods which the station offers to commercial advertisers." *Id.*, at 1090. Like the initial policy statement issued in 1972, this report lends little credence to the new-found power of the Commission to oversee with an iron hand the implementation of § 312 (a)(7).

In terms of the degree to which broadcaster editorial judgments should be subject to review and reversal by the Commission—the most important issue in this litigation—it is evident that the Commission has been quite inconsistent. Its present radical interpretation of § 312 (a)(7) plainly rejects its earlier and more contemporaneous pronouncements as to the meaning and scope of the broadcasters' duties and of its own authority under § 312 (a)(7).

4. Equally, if not more fundamental, the Commission's opinions in this case are singularly unpersuasive. They contain a plethora of admonitions to the broadcast industry, some quite vague and others very specific but often inconsistent. Altogether, in operation and effect, they represent major departures from prior practice, from prior decisions, including those of this Court, and from congressionally recognized policies underlying the Federal Communications Act. As I have indicated, we should not endorse them without much clearer congressional direction than is apparent in the actions leading to the adoption of § 312 (a)(7). I shall men-

tion my major difficulties with the Commission's opinion and judgment.

4a. The Commission stated in a footnote that it should not differ with broadcaster decisions with respect to a candidate's access unless " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' " an approach reflecting its traditional stance vis-à-vis the broadcasters. 74 F. C. C. 2d, at 642, n. 16. The Commission had already determined, however, that because § 312 (a)(7) was not self-explanatory on its face and because it failed to find explicit guidance to the contrary in the legislative history, it would and should exercise wide discretion in interpreting and enforcing the Act. It is therefore not surprising that the Commission's assertions of deference to editorial judgment are palpably incredible.[3]

The Commission first confounds itself by announcing that the duty to provide access attaches when the campaign begins and that this threshold issue was to be "based on [an] independent evaluation of the status of the campaign taking into account the position of the candidate and the networks as well as other factors" 74 F. C. C. 2d, at 665. This effectively withdrew the issue of timing from the area of broadcaster judgment and transformed it into a question of law to be determined by the Commission *de novo*. It was also a major shift in the agency's position, for its Broadcast Bureau just two years before had ruled that the assessment of when a campaign is sufficiently underway to warrant the provision of access was to be left to broadcaster discretion: "A licensee's discretion in providing coverage of elections extends not only to the type and amount of time to be made available to candi-

---

[3] Of a similar tenor is the Court of Appeals' observation that "[t]he interference with editorial discretion" created by the rigid scheme of regulatory oversight it was endorsing "seems no more or less" than had existed under the broad public interest standard. 202 U. S. App. D. C. 369, 391, n. 102, 629 F. 2d 1, 23, n. 102.

dates, but to the date on which its campaign coverage will commence." *Anthony R. Martin—Trigona,* 66 F. C. C. 2d 968, 969 (Broadcast Bureau 1977), application for review denied, 67 F. C. C. 2d 33, reconsideration denied, 67 F. C. C. 2d 743 (1978). Although I have some difficulty in perceiving why the access obligation should begin when "the campaign" is underway, even if there is such a triggering event, reasonable men could differ as to when that moment has arrived. The Commission overstepped its authority in imposing its own answer on the industry and in rejecting the networks' reasonable submissions. The Commission gave no explanation whatsoever for its action in this respect. In fact, it did not even acknowledge that it was making its own *de novo* determination until it issued its opinion on reconsideration.

4b. The Commission ruled that in responding to its obligation to provide reasonable time, a broadcaster should place particular emphasis on the candidates' needs, weigh each request in its own specific context on a particularized basis, and tailor its response to the individual candidate. This approach expressly rejects the thesis of § 315 that all candidates be treated equally. If the networks in this case had responded affirmatively to the candidate's request, § 315 would require that equal time be extended to all other Democratic candidates and would forbid any kind of individualized consideration that would result in giving them less time than had been previously given to their competitor. There is no trace of support in the language of the Act or in the legislative history for this unrealistic approach to § 312 (a)(7). Nor does the Commission offer any tenable explanation why a broadcaster's decision to provide equal time for all candidates is a violation of the obligation to provide reasonable time to each of them. The inference may be drawn from the Commission's position that reasonable access may require unequal access, but § 315 requires equal time for all once it is

granted to anyone. The Commission's rejection of the equality approach as one of the possible ways of complying with § 312 (a)(7) is a plain error.

Of course, the individualized-need approach requires a broadcaster to make an assessment with respect to each request for time, and each of these countless assessments will be subject to review by the Commission. If the degree of oversight to be exercised by the Commission is to be measured by its work in these cases, there will be very little deference paid to the judgment and discretion of the broadcaster. The demands of the candidate will be paramount. As Commissioner Lee said in this litigation: "I have listened carefully to my colleagues explain how this decision leaves broadcast discretion with the networks. However, the decision doesn't have this effect. By the time the majority finishes its analysis of the networks' reasons for not giving time, the networks do not have any choice other than to give the requested time. No other weighing of factors is reasonable in the view of the majority." 74 F. C. C. 2d, at 681 (footnote omitted).

4c. Indicative also of the stringent degree of oversight that the Commission now intends to exercise is the manner in which it dealt with the networks' suggestions that in responding to the request for time involved here, they were entitled to take into account the fact that a total of 122 persons had filed notices of candidacy for the Presidency with the Federal Election Commission. The Commission conceded that this was a proper concern and that Republican candidates might have to be treated equally with Democrats. The Commission, however, in its political wisdom, concluded that it was "unlikely" that more than a tiny percentage of all candidates would request time, the net effect being that the networks' anticipations based on their professional experience were rejected. As petitioner CBS submits in its brief: "Broadcasters are not permitted to consider the likelihood of multiple future requests by similarly situated candidates un-

less the imminence of such requests can be demonstrated to a near certainty. But the likelihood that there will be multiple demands from other candidates is not susceptible to proof in advance. Candidate needs are necessarily shifting in nature, and no candidate can supply a precise prediction of his future plans. Thus, under the Commission's approach, broadcasters can give only limited, if any, weight to potential disruption of normal program schedules, or their view that other material would better serve the interests of their audiences." Brief for Petitioner in No. 80–207, p. 38 (footnotes omitted).

4d. The Court tells us: "If broadcasters take the appropriate factors into account and act reasonably and in good faith, their decisions will be entitled to deference even if the Commission's analysis would have differed in the first instance." *Ante*, at 387. But this language can be taken with a grain of salt, since the Commission, the Court of Appeals, and the majority give the networks no deference whatsoever. This is so because the "appropriate factors" are designed to eviscerate broadcaster discretion. The abrupt departure from accepted norms and the truly remarkable extent to which the Commission will seek to control the programming of political candidates in the future is best demonstrated by its rejection, as being unreasonable, of the submissions filed by the networks in response to the complaints, these submissions being summarized in the networks' briefs as follows:

CBS:

"On October 11, 1979, Gerald M. Rafshoon, President Carter's media adviser, asked CBS to offer the Carter/Mondale Presidential Committee, Inc. (the 'Carter Committee') a thirty-minute paid program on the CBS Television Network between 8:00 p.m. and 10:30 p.m. EST during the period December 4 to 7, 1979. The program, which was to be run following President Carter's anticipated announcement of his candidacy for reelection on

December 4, was described as 'a documentary outlining the President's record and that of his administration.' J. A. 39. CBS declined to offer a half-hour period that early in the campaign, but did offer two five-minute periods, one in the prime evening hours and one in the daytime hours, as it had to two other presidential candidates. J. A. 44–45.

"On October 29, 1979, the Carter Committee filed a complaint with the Commission alleging that CBS, ABC and NBC had violated Section 312 (a)(7). In its response to the complaint and later pleadings, CBS asserted that its decision had been reasonable. CBS stated that it had traditionally sold half-hour periods during later campaign periods and that it intended to do so in the 1980 campaign. J. A. 80. It emphasized that its sales policies were designed to assure evenhanded treatment of candidates. J. A. 170–173. CBS pointed out that the Carter Committee request had been made even before the President had announced his candidacy and more than a year before the general election. It also pointed out that campaigns for the presidential nominations consisted not of one national contest, but of a series of state delegate contests extending over a long period of time; that the first of these contests was more than four months away; and that it was not reasonable to expect networks to sell half-hour periods nationally at such an early date. Moreover, CBS noted that there were a large number of actual and potential candidates for the Presidency; that two candidates for the Republican nomination had already requested half-hour periods; and that a substantial disruption of regular programming would occur if multiple requests were received and granted. J. A. 78–84. CBS further pointed out that an incumbent President has unparalleled opportunities to present his views to the public by means of the broadcast media. J. A. 170–71."

Brief for Petitioner in No. 80–207, pp. 4–5 (footnotes omitted).

NBC:

"NBC responded by letter of October 23, 1979 declining the request to purchase time (JA 42). In its letter NBC noted that it had carefully evaluated the request, but concluded that the earliness of the requested broadcast dates (eight months before the Democratic National Convention and 11 months before the national election), the multiplicity of federal candidates at that stage of the campaign (12 announced candidates had held national elective office or been Governor of a state), and NBC's obligation under Section 315 (a) of the Communications Act to provide equal half-hour time periods to all candidates requesting it should NBC honor the President's request, were all factors in its decision. NBC also noted that since the nomination process was focused at that time on political activities in individual states, such as the Iowa Caucus, the Committee might wish to contact individual local stations in those states." Brief for Petitioner in No. 80–214, pp. 3–4.

ABC:

"In a letter dated October 23, 1979, ABC advised Mr. Rafshoon that it could not comply with the Committee's request for time on one of the early December dates, but that it expected to make time available early in 1980. J. A. 41. . . .

. . . . .

"In response, ABC explained the factors which had led it to conclude that political time sales could reasonably commence in early January, 1980—instead of on the specific dates requested. Thus, the first of 36 Presidential primaries was, at that time, nearly four months away and the Democratic National Convention was more than

eight months away. J. A. 54–55. ABC also noted that the potential for program schedule disruption would be considerable if the Committee were sold time in early December, as multiple candidates would likely assert equal opportunities rights under Section 315 (a) of the Communications Act. J. A. 56. In this regard, ABC observed that at least nine Republicans had already declared their candidacy and that two Democratic leaders and a tenth prominent Republican were expected to announce within a short period of time. Finally, ABC emphasized that its continuing news coverage ensured that 'the mixture of issues, developments (including candidate announcements) and personalities that dominate this early stage of the campaign are brought to the public's attention.' J. A. 57." Brief for Petitioner in No. 80–213, pp. 6–7.

None of these justifications is patently unreasonable. They become so only because of the Commission's conclusion, adopted by the majority, that the reasonableness of access is to be considered from the individual candidate's perspective, including that candidate's particular "needs." While both the Court and the Commission describe other factors considered relevant such as the number of candidates and disruption in programming, the overarching focus is directed to the perceived needs of the individual candidate. This highly skewed approach is required because, as the Court sees it, the networks "seek the unilateral right to determine in advance how much time to afford *all* candidates." *Ante*, at 389. But such a right, reasonably applied, would seem to fall squarely within the traditionally recognized discretion of the broadcaster. Instead of adhering to this traditional approach, the Court has laid the foundation for the unilateral right of candidates to demand and receive any "reasonable" amount of time a candidate determines to be necessary to execute a particular campaign strategy. The concomitant Commission in-

volvement is obvious. There is no basis in the statute for this very broad and unworkable scheme of access.[4] Commissioner Washburn's dissenting observation is surely correct:

> "In addition, the document adopted by the majority today goes far beyond the proper limits of Commission responsibility in political broadcasting matters. In detail (see pages 12–13, paragraphs 13–35) it substitutes the Commission's judgment for the broadcaster's own good faith interpretation of candidate requests and his response thereto. Such governmental intrusion is unwarranted, is illegal and, I fear, will have far-reaching consequences that will come back to haunt the Commission and the public again and again." 74 F. C. C. 2d, at 682.

JUSTICE STEVENS, dissenting.

In my judgment, the question whether a broadcast licensee has violated 47 U. S. C. § 312 (a)(7) by denying a political candidate reasonable access to broadcast time must be an-

---

[4] The statute permits revocation upon "willful or repeated" refusal to afford reasonable access. I think this language indicates that the Commission would intervene in only the most egregious of circumstances—such as an outright refusal to afford any time regardless of the circumstances. Consistent with this view, Senator Scott described § 312 (a)(7) as directed at those few broadcasters who acted in "blatant disregard for the public interest." Federal Election Campaign Act of 1971: Hearings before the Subcommittee on Privileges and Elections of the Senate Committee on Rules and Administration, 92d Cong., 1st Sess., 103 (1971). The majority, however, reads this language as an open invitation for Commission intervention. A single "willful" violation is sufficient to trigger overview and immediate revocation. *Ante,* at 378. Since the Court has sustained the Commission's finding that the networks violated § 312 (a)(7) and since a violation of § 312 (a)(7) requires either willful or repeated refusal of reasonable access, it follows that the networks have been found to have acted willfully within the meaning of the statute and that their licenses are subject to immediate revocation. I doubt Congress intended to put the licenses of all broadcasters into a state of jeopardy on such tenuous grounds.

swered in the context of an entire political campaign, rather than by focusing upon the licensee's rejection of a single request for access. The licensee has a duty to act impartially and to make an adequate quantity of desirable time available. The performance of that duty cannot be evaluated adequately by focusing solely on particular requests or the particular needs of individual candidates. The approach the Federal Communications Commission has taken in this litigation, now adopted by the Court, creates an impermissible risk that the Commission's evaluation of a given refusal by a licensee will be biased—or will appear to be biased—by the character of the office held by the candidate making the request.* Indeed, anyone who listened to the campaign rhetoric that was broadcast during 1980 must wonder how an impartial administrator could conclude that any Presidential candidate was denied "reasonable access" to the electronic media. That wonderment is not dispelled by anything said in the opinions for the majority of the Commission in this litigation.

In sum, I find JUSTICE WHITE's analysis of the issue compelling. I accordingly join his opinion.

---

*The possibility that Commission decisions under § 312 (a) (7) may. appear to be biased is well illustrated by this litigation. In its initial decision and its decision on the networks' petitions for reconsideration, the Commission voted 4–3 in favor of the Carter-Mondale Presidential Committee. See 74 F. C. C. 2d 631, 652, 653, 654 (1979). In both instances, the four Democratic Commissioners concluded that the networks had violated the statute by denying the Committee's request for access; the three Republican Commissioners disagreed. See Federal Communications Commission, 45th Annual Report/Fiscal Year 1979, pp. 1–2, 86–87 (1980). See also 202 U. S. App. D. C. 369, 400–401, and n. 16, 629 F. 2d 1, 32–33, and n. 16 (1980) (Tamm, J., concurring).