717 F.2d 1471
 230 U.S.App.D.C. 414, 9 Media L. Rep. 2272
 DEMOCRATIC NATIONAL COMMITTEE, Democratic Congressional
Campaign Committee, and Democratic Senatorial
Campaign Committee, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
CBS, Inc. and National Broadcasting Company, Inc., Intervenors.
 No. 82-1872.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 18, 1983.
Decided September 27, 1983.
 
 Petition for Review of an Order of the Federal Communications commission.
 Charles D. Ferris, Washington, D.C., with whom Frank W. Lloyd, Bruce D. Sokler, and L. Gregory Ballard, Washington, D.C., were on the brief, for petitioners.
 David Silberman, Atty., F.C.C., Washington, D.C., with whom Marjorie S. Reed, Acting Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., and John J. Powers, III and George Edelstein, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Stephen A. Sharp, Atty., F.C.C., Washington, D.C., entered an appearance for respondents.
 
 
 1
 Timothy B. Dyk, Washington, D.C., with whom J. Roger Wollenberg and Bruce D. Ryan, Washington, D.C., were on the brief, for intervenor CBS, Inc. Judith Barry Wish, Washington, D.C., entered an appearance for intervenor CBS, Inc.
 
 
 2
 Howard Monderer and John F. Sturm, Washington, D.C., were on the brief for intervenor Nat'l. Broadcasting Co., Inc.
 
 
 3
 Andrew Jay Schwartzman, Washington, D.C., was on the brief for amicus curiae Telecommunications Research and Action Center urging reversal.
 
 
 4
 Before WRIGHT and MIKVA, Circuit Judges, and SWYGERT,* Senior Circuit Judge.
 
 
 5
 Opinion PER CURIAM.
 
 PER CURIAM:
 
 6
 We are called upon to decide whether the Federal Communications Commission correctly denied a fairness doctrine complaint that the Democratic National Committee (DNC) filed against the Columbia Broadcasting System (CBS) and the National Broadcasting Company (NBC). DNC alleges that during the fall of 1981 CBS and NBC violated the fairness doctrine by failing to provide adequate coverage to points of view critical of the Reagan Administration's economic policies. The Commission ruled that DNC failed to present a prima facie case of a fairness doctrine violation because the evidence it offered indicated neither that the networks' overall programming was "unreasonably imbalanced" nor that the public had been left "uninformed." Memorandum Opinion and Order, FCC 82-248 (hereinafter Opinion ), at 13, Joint Appendix (JA) 184. We affirm the Commission's decision.
 
 I. FACTUAL BACKGROUND
 
 7
 From late September through early November 1981, CBS and NBC broadcast a series of paid 30-second spot advertisements supporting President Reagan's economic program. The Republican National Committee (RNC) sponsored the advertisements.
 
 
 8
 On October 19, 1981 counsel for DNC wrote letters to CBS and NBC complaining of the networks' broadcast of the RNC advertisements. Letter to CBS, JA 62-65; Letter to NBC, JA 76-79. The letters claimed that the advertisements addressed a controversial issue of public importance, i.e., the merits of President Reagan's economic program, and that the networks' programming failed to offer the public reasonable access to contrasting views. DNC asked the networks to provide detailed information regarding their airing of the RNC advertisements and of opposing viewpoints. DNC also stated that it intended to file a fairness doctrine complaint with the Commission seeking a ruling that CBS and NBC were obligated to provide time, without charge, to DNC in order to balance the messages sponsored by RNC.
 
 
 9
 NBC responded to DNC on October 17, 1981 and CBS responded on November 6, 1981. NBC Response, JA 82; CBS Response, JA 68. Each network stated that it had complied with the fairness doctrine, notwithstanding the broadcasts of the RNC advertisements, because it had aired contrasting views on the Reagan Administration's economic program in its overall programming.
 
 
 10
 On December 22, 1981 DNC filed a complaint with the Commission, asserting:
 
 
 11
 The extensive airing by CBS, NBC, and individual stations of the Republican issue-oriented spot commercials on the President's economic program clearly raises a Fairness Doctrine issue under the Commission's standards. These commercials present one side of controversial issues of public importance. By their frequency and timing they throw out of balance network or station coverage of the issues they address, even if that coverage might otherwise be shown to meet the Commission's standard of reasonableness.
 
 
 12
 Fairness Doctrine Complaint (hereinafter Complaint ) at 10-11, JA 11-12.[1]
 
 
 13
 Subsequently DNC submitted to the Commission affidavits from four officials of DNC and affidavits from four unaffiliated individuals. Letter of January 22, 1982 from Counsel for DNC to FCC Attaching Affidavits, JA 116-125.[2] Each of the affiants stated that during the preceding six months he had been a regular viewer of CBS and NBC network programming, that he had seen "some programming" in which views opposing the Administration's economic plan had been presented, but that in his opinion such programming had not balanced the views expressed in the Republican commercials.
 
 
 14
 Although not asked by the Commission to do so, CBS submitted a response to DNC's complaint on January 20, 1982. Response of CBS Inc. to Fairness Doctrine Complaint, JA 88-115. In this response CBS argued, inter alia, that the DNC complaint had failed to provide any specific facts--as opposed to general, conclusory assertions--which would indicate that CBS had not provided reasonable coverage of contrasting views of the Administration's economic program in its overall programming. After receiving the CBS response, DNC indicated to the Commission that it intended to file additional material on network programming in reply to the CBS response.
 
 
 15
 In its reply of February 9, 1982 DNC offered information derived from two news monitoring services. Reply by DNC to CBS Response, JA 126-159. DNC calculated that during September and October 1981 and from November 17, 1981 through December 17, 1981 the CBS evening news had presented Republican views on the Administration's economic program during a total of 37 minutes and 33 seconds and Democratic views during a total of 17 minutes and 20 seconds, for a ratio of over two to one in favor of Republicans. Id. at Exhibit 1, JA 149. The comparable figures for NBC were 34 minutes and 30 seconds for Republican views and "12 minutes and 65 seconds" for Democratic views, yielding a ratio of over two and a half to one favoring Republican views. Id. DNC noted that if the RNC advertisements were added to the Republican totals on the nightly news there would be a resulting imbalance of more than four to one on NBC and more than three to one on CBS. Id. at 6, JA 132.
 
 
 16
 DNC's reply of February 9 also included a list of the guests appearing on the CBS weekly news interview program "Face the Nation" from December 14, 1980 through January 24, 1982 and on the NBC weekly news interview program "Meet the Press" from January 4, 1981 through December 27, 1981. Id. at Exhibit 2, JA 150-158. DNC alleged that on "Face the Nation" there was "at least 2 to 1 imbalance" in favor of the Administration's spokespersons over those espousing Democratic and other opposing views. Id. at 7-9, JA 133-135. NBC's record on "Meet the Press" was said to have been "only slightly better." Id. at 9, JA 135. DNC, however, supplied information only with respect to network evening news and weekly interview programs. It supplied no data concerning other aspects of CBS and NBC programming, such as public affairs broadcasts and replies to presidential addresses.
 
 
 17
 The Commission released on June 4, 1982 a Memorandum Opinion and Order rejecting DNC's fairness doctrine complaint against CBS and NBC. The Commission concluded that DNC's complaint failed to meet the threshold requirement necessary to warrant any administrative inquiry into CBS and NBC programming. Specifically, the Commission found that DNC had failed to make a prima facie demonstration that the overall programming of CBS and NBC had not provided reasonable coverage of contrasting viewpoints regarding the Administration's economic policies.
 
 
 18
 The Commission noted that DNC's data indicated that from September through December 1981, when the RNC spots were aired, the networks presented what DNC characterized as "pro-Administration" views approximately "twice as much and twice as often" as "anti-Administration" views. The Commission accepted these figures for the purpose of evaluating the sufficiency of DNC's complaint and concluded that the differences could not be considered "so disparate as to warrant Commission intervention." Opinion at 12, JA 183. The Commission stated that even if, as DNC alleged, the RNC announcements, coupled with pre-existing imbalances, resulted in ratios of three to one or four to one in terms of the frequency with which pro-Administration opinion was aired, "[s]uch an imbalance could hardly be considered a 'glaring' disparity" calling for further investigation. Id. at 13, JA 184. The Commission observed, moreover, that it found it "difficult to envision a case in which a major political party would raise an issue of public importance ignored by the electronic press." Id.
 
 II. ANALYSIS
 A. Standards
 
 19
 Under the fairness doctrine, a broadcaster must devote a reasonable percentage of broadcast time to coverage of controversial issues of public importance and provide a reasonable opportunity for presentation of conflicting views regarding such issues. See generally CBS, Inc. v. Democratic Nat'l Committee, 412 U.S. 94, 110-111, 93 S.Ct. 2080, 2090-91, 36 L.Ed.2d 772 (1973); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 377-378, 89 S.Ct. 1794, 1799-1800, 23 L.Ed.2d 371 (1969); Fairness Report, 48 FCC2d 1 (1974), reconsideration denied, 58 FCC2d 691 (1976), aff'd in part and rev'd in part on other grounds sub nom. Nat'l Citizens Committee for Broadcasting v. FCC, 567 F.2d 1095 (D.C.Cir.1977), cert. denied, 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978). A viewer or listener who believes that a broadcaster is not meeting its fairness doctrine obligations must first complain to the broadcaster. See Broadcast Procedure Manual, 49 FCC2d 1, 5 (1974). A viewer or listener who remains dissatisfied in light of the broadcaster's response may then file a complaint with the Commission.
 
 
 20
 A complaint must present prima facie evidence of a fairness doctrine violation before the Commission will request a response to the complaint from a broadcaster. See Nat'l Committee for Responsive Philanthropy v. FCC, 652 F.2d 189, 191 (D.C.Cir.1981). This screening device is grounded in the belief that "[t]he Commission's policy of encouraging robust, wide-open debate on issues of public importance would in practice be defeated if, on the basis of vague and general charges of unfairness, [the Commission] should impose upon licensees the burden of proving the contrary by producing recordings or transcripts of all news programs, editorials, commentaries, and discussion of public issues, many of which are treated over long periods of time." Federation of Citizens Ass'ns of D.C., 21 FCC2d 12, 13 (1969). To preclude the chilling effect that these insubstantial complaints might cause, the Commission has made the setting forth of a prima facie case into "a formidable procedural barrier." American Security Council Education Foundation v. FCC, 607 F.2d 438, 453 (D.C.Cir.1979) (en banc ) (Wright, J., concurring), cert. denied, 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980).
 
 
 21
 To successfully make out a prima facie case a complainant must submit factual information that, in the absence of rebuttal, is sufficient to make out a fairness doctrine violation. More specifically, a complaint must indicate
 
 
 22
 (1) the particular station involved; (2) the particular issue of a controversial nature discussed over the air; (3) the date and time when the program was carried; (4) the basis for the claim that the station has presented only one side of the question; and (5) whether the station had afforded, or has plans to afford, an opportunity for the presentation of contrasting viewpoints. * * *
 
 
 23
 Applicability of Fairness Doctrine in Handling Controversial Issues of Public Importance (Fairness Primer), 40 FCC 598, 600 (1960). See also Broadcast Procedure Manual, supra.
 
 
 24
 The question this case poses is whether DNC made an adequate initial showing that the targeted networks' overall programming failed to afford a reasonable opportunity for presentation of contrasting points of view regarding the Reagan Administration's economic policies. What constitutes "reasonable opportunity" is largely left to the discretion of broadcasters. See, e.g., American Security Council Education Foundation v. FCC, supra, 607 F.2d at 445 ("At center stage of the Commission's regulatory scheme is its determination that broadcasters should have maximum editorial discretion in deciding how to fulfill fairness doctrine obligations.").[3]
 
 
 25
 The Commission and the courts, however, have charted outer reaches of discretion beyond which broadcasters violate their fiduciary duty to use the public airwaves in the public interest. This court set forth a general guidepost when it declared that "the essential basis for any fairness doctrine, no matter with what specificity the standards are defined, is that the American public must not be left uninformed." Green v. FCC, 447 F.2d 323, 329 (D.C.Cir.1971) (emphasis in original). This does not mean that any exposure, no matter how relatively insignificant, of a particular viewpoint to the public will necessarily fulfill a broadcaster's fairness doctrine obligations. The Commission has observed that an egregious imbalance in presentation of competing viewpoints may actually result in negation of the disfavored viewpoint and thus leave the public effectively uninformed. The Commission has stated, for example, that "it is patently unreasonable for a licensee consistently to present one side in prime time and to relegate the contrasting viewpoint to periods outside prime time. Similarly, there can be an imbalance from the sheer weight on one side as against the other." Committee for Fair Broadcasting of Controversial Issues, 25 FCC2d 283, 293 (1970) (footnote omitted). This imbalance might be "a reflection of the total amount of time afforded to each side, of the frequency with which each side is presented, of the size of the listening audience during the various broadcasts," or of a combination of factors that suggest that fairness has not been achieved. Fairness Report, supra, 48 FCC2d at 17 (emphasis in original). See also Media Access Project, 44 FCC2d 755 (1973) (news coverage of controversial issue on nine occasions insufficient to satisfy fairness doctrine requirement in context of advertising campaign in which opposing message was broadcast "many times"); Energy Action Committee, 64 FCC2d 787 (1977) (news reports on controversial issue totalling five minutes insufficient to satisfy fairness doctrine obligation created by airing of 53 advertisements comprising 41 minutes of programming presenting one side of that controversial issue). See also Public Media Center v. FCC, 587 F.2d 1322 (D.C.Cir.1978); Banzhaf v. FCC, 405 F.2d 1082 (D.C.Cir.1968).
 
 
 26
 The Commission and the courts have emphasized, however, that the balance required in the context of the fairness doctrine is measured, not in terms of equal time or identity of treatment, but rather in terms of good faith and reasonableness, with ample deference given to a broadcaster's conception of what reasonableness entails. See Kennedy for President Committee v. FCC, 636 F.2d 432, 453 (D.C.Cir.1980); Green v. FCC, supra, 447 F.2d at 328. As the Commission has noted:
 
 
 27
 [I]t is just not practicable to require equality with respect to the large number of issues dealt with in a great variety of programs on a daily and continuing basis. Further, it would involve this Commission much too deeply in broadcast journalism; we would indeed become virtually a part of the broadcasting "fourth estate" overseeing thousands of complaints that some issue had not been given "equal treatment". We do not believe that the profound national commitment to the principle that debate on public issue[s] should be "uninhibited, robust, wide-open" (New York Times v. Sullivan, 376 U.S. 254, 270, [84 S.Ct. 710, 721, 11 L.Ed.2d 686] would be promoted by a general policy of requiring equal treatment on all such issues, with governmental intervention to insure such mathematical equality. * * *
 
 
 28
 Fairness Report, supra, 48 FC2d at 16, quoting Committee for Fair Broadcasting of Controversial Issues, supra, 25 FCC2d at 292.
 
 
 29
 Finally, in applying these standards to the facts of this case this court must give considerable weight to the Commission's expert judgment. See, e.g., CBS, Inc. v. Democratic Nat'l Committee, supra, 412 U.S. at 121-132, 93 S.Ct. at 2095-2101; FCC v. WNCN Listeners Guild, 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521 (1981); CBS, Inc. v. FCC, 453 U.S. 367, 390, 101 S.Ct. 2813, 2827, 69 L.Ed.2d 706 (1981).
 
 
 30
 B. Applying the Standards to the Facts of This Case
 
 
 31
 The Commission assumed the validity of the DNC allegations that the RNC advertisements, coupled with existing programming imbalances, created a frequency-of-presentation ratio in which pro-Administration views enjoyed an advantage of approximately three to one on CBS and four to one on NBC.[4] Opinion at 13, JA 184. The Commission found, however, that "[s]uch an imbalance could hardly be considered a 'glaring' disparity" requiring investigation. Id. This finding was based in part on precedent. In response to DNC's emphasis on the extent of the disparity between pro- and anti-Reagan Administration programming in terms of the amount of time afforded each side, the Commission noted that it had found roughly similar disparities to be acceptable. See id. at 13 n. 24, JA 184, citing Great Western Broadcasting Corp. (Broadcast Bureau 1980). With respect to the size of the viewing audience during the various broadcasts, the Commission observed that DNC presented "no evidence" suggesting that the sizes of the audiences viewing pro-Administration programming versus anti-Administration programming were not comparable. Id. at 13, JA 184. We find that these considerations reasonably support the Commission's conclusion. None of DNC's several arguments persuades us to reverse or remand, although, as we note below, there are dicta in the Commission's order that we specifically disapprove.
 
 
 32
 DNC maintains that the Commission's decision is erroneous because the Commission equated mere exposure with balance, improperly suggesting that "the public's receipt of any information on a viewpoint, * * * no matter how great the overall imbalance of coverage on it, is sufficient to preclude a finding of imbalance." Brief for petitioners at 21-22. This description mischaracterizes the analysis set forth in the Commission's Memorandum Opinion and Order. The Commission did not in its opinion refer to any new "exposure" standard for evaluating fairness doctrine complaints, but instead followed established guidelines, inquiring not only whether the targeted networks' programming had left the public uninformed but also whether the programming had been unreasonably imbalanced. Opinion at 12-13, JA 183-184. Behind DNC's argument is an implicit attempt to have this court erect an equal time standard under which compliance with the fairness doctrine would be determined by reference to rough approximations of equality rather than by reference to broadcaster good faith and reasonableness. But the fairness doctrine is distinct from the statutory requirement of the Communications Act that equal time be allotted to all qualified candidates for public office. See 47 U.S.C. Sec. 315(a) (1976). Whereas the equal time provision requires, as its name implies, rigorous equality in application, the fairness doctrine "nowhere requires equality but only reasonableness." Democratic Nat'l Committee v. FCC, 460 F.2d 891, 905 (D.C.Cir.), cert. denied, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972). See also Kennedy for President Committee v. FCC, supra, 636 F.2d at 452-453. Reasonableness was the guidepost that the Commission correctly used in reaching its decision regarding DNC's complaint.
 
 
 33
 DNC also maintains that the Commission's decision is erroneous because the Commission improperly restricted its analysis of the reasonableness of the networks' programming imbalance to an examination of total time ratios. Brief for petitioners at 40-43. This charge is inaccurate. The Commission specifically noted that the size of the viewing audience during broadcasts is a factor to consider in determining whether licensees have afforded a reasonable opportunity for presentation of contrasting viewpoints. Opinion at 12, JA 183. But the Commission observed that DNC had "presented no evidence that the sizes of the viewing audiences during the various broadcasts were not comparable." Id. at 12-13, JA 183-184 (footnote omitted). Similarly, DNC failed to present evidence indicating the frequency with which RNC advertisements and other relevant programming were aired. The Commission, then, did not restrict its analysis of the reasonableness of the networks' presentation of contrasting views; rather, DNC restricted the Commission's analysis by failing to present evidence important to building its prima facie case.
 
 
 34
 Finally, DNC asserts that the Commission's denial of its fairness doctrine complaint is erroneous because the Commission failed to recognize that the messages propounded by the RNC advertisements cannot adequately be balanced merely by presentation of contrasting viewpoints in news programming. In petitioners' words: "DNC does not believe that the Fairness Doctrine obligations arising from the running of 30-second, high-impact commercial advertising on 'a regular continual basis' can normally be discharged * * * by presentation of opposing views on news programs, even where they are presented in a manner favoring the opposing viewpoints." Brief for petitioners at 36. However, neither the Commission nor the courts have established petitioners' belief as law. To the contrary, both have emphasized, time and again, the wide discretion available to licensees in determining how to fulfill their fairness doctrine obligations, including the option of offsetting the messages of advertisements by public service messages or news accounts or other modes of presentation in a licensee's overall programming. See, e.g., Friends of the Earth v. FCC, 449 F.2d 1164, 1170 (D.C.Cir.1971); California Against Initiative Fraud, 78 FCC2d 469, 471-472 (Broadcast Bureau 1980). See also Fairness Report, supra, 48 FCC2d at 16.
 
 III. CONCLUSION
 
 35
 Despite formidable obstacles facing one who makes a fairness doctrine complaint,[5] the doctrine remains a vital aspect of a broadcasting regime characterized by a delicate balance of fiduciary duties to the public and rights of journalistic discretion. We think it necessary to emphasize the continuing vitality of the fairness doctrine in all aspects of programming because of dicta in the Commission's opinion that might be perceived by some to suggest that it may be futile to challenge broadcasters on fairness doctrine grounds with respect to issues raised by national political parties in advertisements. The passage we refer to reads:
 
 
 36
 We note that ordinarily issues raised by national political parties during paid broadcasts are by their nature matters of public importance and part of the national agenda of issues. These are, by and large, issues also covered by national news networks, whether in daily news broadcasts, news interviews or special presentations. In terms of practicality, coverage of the various viewpoints on national issues is part and parcel of national news coverage. We find it difficult to envision a case in which a major political party would raise an issue of public importance ignored by the electronic press.
 
 
 37
 Opinion at 13, JA 184. Two commissioners who otherwise concurred in the Commission's Memorandum Opinion and Order objected to this gratuitous comment. Commissioner Rivera observed that the Commission's statement may "create uncertainties or unintended implications in the law of political broadcasting." Statement of Commissioner Henry M. Rivera Dissenting in Part, JA 188. Similarly, Commissioner Jones objected, noting that the offending comment "may be read as indicating prejudgment by the Commission as to the validity of complaints of this type which may be filed in the future." Concurring Statement of Commissioner Anne P. Jones, JA 189.
 
 
 38
 We agree with Commissioners Rivera and Jones, and we specifically disapprove the language cited above. This language, however, was wholly unnecessary to the conclusion reached by the Commission. And because that conclusion is supported by the record and reasonably articulated by the Commission, we affirm the Commission's decision to reject DNC's fairness doctrine complaint.
 
 
 39
 So ordered.
 
 UNITED STATES COURT OF APPEALS
 District of Columbia Circuit
 DECISIONS WITHOUT OPINIONS
 
 40
 The following cases have been decided under Local Rule 13(c) without opinion. An asterisk identifies those cases where the judgment or order is accompanied by a Memorandum explanatory of the judgment. Such Memorandum is not included with the opinions of the Court that are printed, and it may not be cited in briefs or memoranda of counsel as precedents, under Local Rule 8(b). However, as Rule 8(b) makes clear, the reasons set forth in the Court's memorandum may be referred to for purposes of doctrines such as res judicata, collateral estoppel, and law of the case, which turn on the binding effect of the judgment, and not on its status as precedent for other cases.
 
 
 41
 Appeal from
 Docket and Citation
Title Number Date Disposition (if reported)
------------------------ -------- ------- -------------- --------------
Chrysler Credit
 Corp. v. Capitol
 Hill Dodge, Inc......... 82-2483, 9/14/83 AFFIRMED D.C.D.C.
 82-2484 AND
 REMANDED
Grace v. Burger ......... 80-2044 9/ 6/83 CASE D.C.D.C., 665
 REMANDED F.2d 1193
Hemphill v. Devine ...... 82-2448 9/21/83 AFFIRMED D.C.D.C.
Kimble v. Ball-
 Healy-Granite .......... 82-1617 9/20/83 AFFIRMED D.C.D.C.
Marine Telephone
 Operators Ass'n
 F.C.C................... 83-1056 9/22/83 AFFIRMED F.C.C.
Sales v. U.S.
 Dept. of Justice ....... 82-2505 9/20/83 AFFIRMED D.C.D.C., 549
 F.Supp. 1176
Scurek v. N.L.R.B........ 82-2440 9/12/83 AFFIRMED N.L.R.B.
Tift v. Inter-American
 Development Bank ....... 83-1009 9/21/83 AFFIRMED* D.C.D.C.
 
 
 
 *
 Of the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. Sec. 294(d) (Supp. V 1981)
 
 
 [1]
 Elsewhere in its complaint DNC stated its case more passionately:
 The DNC believes that the RNC-sponsored spot commercials aired by CBS and NBC, by their frequency and timing, have dominated with a single view the broadcast discussion of the impact, equity and effectiveness of the Reagan Administration's economic program. This high priced media blitz has grossly overstated the balance of the dialogue of this controversial issue of utmost public importance and in effect overwhelmed other points of view and perspectives necessary for the American public to make a fully informed decision on this critical issue.
 Complaint at 2, JA 3.
 
 
 [2]
 DNC offered the affidavits in response to a letter from the Commission advising DNC to either submit the affidavits or rest its case against the networks on the allegations proffered in its initial complaint. Letter of January 7, 1982 from FCC to Counsel for DNC, JA 86-87
 
 
 [3]
 See also Fairness Report, 48 FCC2d 1, 17 (1974):
 From the standpoint of the licensee * * * the most important protection against arbitrary Commission rulings is the fact that we will not substitute our judgment for his. Our rulings are not based on a determination of whether we believe that the licensee has acted wisely or whether we would have proceeded as he did. Rather, we limit our inquiry to a determination whether, in the light of all of the facts and circumstances presented, it is apparent that the licensee has acted in an arbitrary or unreasonable fashion.
 
 
 [4]
 The Commission noted, however, that if overall programming were taken into account, these ratios would probably be somewhat reduced. See Opinion at 13 n. 24, JA 184
 
 
 [5]
 A successful fairness doctrine complainant is a rare creature:
 If the fiscal years 1973 through 1976 are combined, a total of 49,801 fairness complaints received by the Commission resulted in 244 station inquiries (.406 percent of complaints), 54 adverse rulings (.108 percent of complaints), and 16 general fairness doctrine rulings (.0321 percent of complaints). Of every 1,000 complaints received between FY 1973 and FY 1976, approximately 4 resulted in station inquiries, 1 in an adverse ruling, and " 1/3 of 1" in a general fairness adverse ruling. The average complainant truly had only about one in a thousand chance.
 S. SIMMONS, THE FAIRNESS DOCTRINE AND THE MEDIA 210-211 (1978). The rarity of successful fairness doctrine complaints continues. Relying upon information recently provided by the FCC to the Telecommunications, Consumer Protection, and Finance Subcommittee of the House Committee on Energy and Commerce, the Telecommunications Research and Action Center informed this court that
 although there are approximately 10,000 licensed broadcast outlets, there were only 31 such inquiries involving both the fairness doctrine and "political broadcasting" (i.e., equal opportunities, "lowest unit rate," "reasonable access," etc.) in 1980. Of these, only 7 cases resulted in determinations adverse to the licensee. In 1981, there were 27 inquiries and 8 adverse decisions. Thus, the likelihood is about 1/10 of 1% that a given licensee will receive an adverse determination in any given year. Typical sanctions are letters of admonition. * * *
 Brief for amicus curiae Telecommunications Research and Action Center at 11 n. 1.