BLUE CROSS OF RHODE ISLAND and Blue Shield of Rhode Island, Plaintiffs,

v.

Joseph E. CANNON, in his capacity as Director of the Department of Health for the State of Rhode Island, and William Carroll, in his capacity as Director of the Department of Business Regulation for the State of Rhode Island, Defendants,

Ocean State Master Health Plan, Inc., Defendant/Intervenor.

Civ. A. No. 83–0772 S.

United States District Court, D. Rhode Island.

June 22, 1984.

Elizabeth A. Germani, Tillinghast, Collins & Graham, Edwin Hastings, Normand G. Benoit, John M. Boehnert, Providence, R.I., for plaintiffs.

Lawrence A. Iacoi, Dennis J. Roberts, II, Atty. Gen., Joseph G. Miller, Sp. Asst. Atty. Gen., Providence, R.I., for defendants.

Almonte, Lisa & Pisano, Thomas A. Lynch, Providence, R.I., Epstein, Becker, Borsody & Green, P.C., Robert J. Moses, William G. Kopit, Stephen S. Boochever, Washington, D.C., for intervenor O.S.M. H.P.

## OPINION AND ORDER

SELYA, District Judge.

This is an action brought by Blue Cross of Rhode Island and Blue Shield of Rhode Island (collectively, Blue Cross) for injunctive and declaratory relief to prevent the implementation and enforcement of several portions of Rhode Island's Health Maintenance Organization Act of 1983, R.I.Gen. Laws §§ 27–41–1 *et seq.* (State HMO Act). The State HMO Act is a comprehensive statutory scheme which provides for the licensure and subsequent regulation of health maintenance organizations in Rhode Island. In this action, the plaintiffs challenge the validity of the so-called "dual option" provision contained in R.I.Gen. Laws § 27–41–27. Ancillary thereto, the plaintiffs contest the legality of R.I.Gen. Laws § 27–41–14(5) [1] insofar as that statute proscribes the use of the phrase "health maintenance organization" or kindred terminology to describe any entity other than one which has been licensed under the State HMO Act. Plaintiffs' eight count complaint sets forth a salmagundi of alleged violations both of federal law and of the Constitution of the United States. These protestations are grounded variously in the preemption provision of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* (ERISA), the Supremacy, Contract and Commerce Clauses of the Constitution, and the First and Fourteenth Amendments to the Constitution.

The defendants, Joseph E. Cannon and William Carroll, respectively, are the directors of the two state agencies responsible for the enforcement of the State HMO Act, *see* R.I.Gen.Laws § 27–41–21, and

each is sued in his representative capacity.[2] The defendant/intervenor, Ocean State Master Health Plan, Inc., is a duly licensed State HMO. By virtue of an order entered December 19, 1973, with the acquiescence of the parties, the status quo has been preserved *pendente lite.* At the same time, Ocean State was granted permission to apply for intervention. The intervenor's ensuing motion, brought in pursuance of Fed.R.Civ.P. 24, was unopposed, and was granted on January 10, 1984.

Following much procedural skirmishing and extensive discovery, and after various amendments to the December 19 order (none of which need be discussed in detail here), the matter is now before the court on cross motions for summary judgment as to count one of the plaintiffs' complaint (which avers in substance that the dual option provision, R.I.Gen.Laws § 27–41–27, is preempted by an ERISA provision, 29 U.S.C. § 1144), and upon the defendants' and defendant/intervenor's alternative motions to dismiss that claim on the grounds (i) that it is not ripe for review as required by Article III of the Constitution of the United States, (ii) that Blue Cross lacks the requisite standing to assert such a claim, and (iii) that there is no "actual controversy" within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201. All parties filed extravagant briefs addressing both the justiciability and the merits of plaintiff's ERISA preemption claim, along with a plentitude of affidavits and related materials. Oral arguments were heard on May 10, 1984, and the matter was taken under advisement at that time.

---

1. R.I.Gen.Laws § 27–41–14(5) provides:

   No person, unless in possession of a valid license as a health maintenance organization pursuant to this chapter, may use the phrase "health maintenance organization" or the abbreviation "HMO," or any words descriptive of the health maintenance organization business or deceptively similar to the name or description of any health maintenance organization doing business in this State in the course of operation. No person, unless in possession of a valid license as a health maintenance organization pursuant to this chapter, may use the phrase "independent practice as-

sociation" or the abbreviation "IPA" in the course of operation.

2. Suit was originally brought against Thomas A. Caldarone, Jr., as director of Rhode Island's department of business regulation. Caldarone has since relinquished his office in order to accept an appointment to the bench of the state superior court, and the present director, Carroll, has automatically succeeded him as a defendant herein. *See* Fed.R.Civ.P. 25(d). A stipulation substituting Carroll was entered into by the parties on April 11, 1984 and was subsequently approved by the court on April 18, 1984.

## I.

The plaintiffs are non-business corporations organized under the laws of Rhode Island as a hospital service corporation and a medical service corporation, respectively. In those capacities, Blue Cross contracts (1) with subscribers to provide defined health care benefits or coverage on the basis of payment of periodic premiums, (2) with hospitals with respect to reimbursement for institutional services rendered by the contracting hospitals to Blue Cross subscribers, (3) with doctors and allied health care professionals regarding reimbursement for medical services rendered by participating physicians to such subscribers, and (4) with various employers to provide group coverage for employees qua subscribers.

The plaintiffs currently employ approximately one thousand individuals within Rhode Island, and sponsor an employee welfare benefit plan (BCEWBP) for Blue Cross personnel. That plan provides for certain health care and kindred benefits

and other emoluments, and is subject to the sweeping regulatory mosaic postulated by ERISA.[3] In addition to its role as the patron of the BCEWBP, Blue Cross acts as the plan's fiduciary, and is responsible for the control, management, and administration of the BCEWBP.

As noted previously, Ocean State is licensed under the State HMO Act and is engaged in the furnishing of health care services to Rhode Islanders. There are, of course, a myriad of modes in which the delivery of such services may be accomplished. And, health maintenance organizations may fit within the integument of the system in a number of ways. Ocean State functions as an open panel independent practice association (IPA). Translated from insider jargon, this means, in essence, that Ocean State contracts with physicians in private practice to furnish medical services to Ocean State assentators.[4] Ocean State is presently the only HMO licensed under the newly-enacted State HMO Act.[5]

3. 29 U.S.C. § 1003 provides in material part: (a) ... [T]his subchapter shall apply to any employee benefit plan if it is established or maintained—
   (1) by any employer engaged in commerce or in any industry or activity affecting commerce; or
   (2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or
   (3) by both.
   (b) The provisions of this subchapter shall not apply to any employee benefit plan if—
   (1) such plan is a governmental plan (as defined in section 1002(32) of this title);
   (2) such plan is a church plan (as defined in section 1002(33) of this title) with respect to which no election has been made under section 410(d) of Title 26;
   (3) such plan is maintained solely for the purpose of complying with applicable workmen's compensation laws or unemployment compensation or disability insurance laws;
   (4) such plan is maintained outside of the United States primarily for the benefit of persons substantially all of whom are nonresident aliens; or
   (5) such plan is an excess benefit plan (as defined in section 1002(36) of this title) and is unfunded.
   The statute contemplates certain minor exceptions, which all parties concede are immaterial for purposes of this litigation.

4. In the vernacular, HMOs which (like Ocean State) function through the medium of IPAs are familiarly known as "HMOs without walls," as the centrosymmetric feature of the enterprise is that subscribers can continue to be treated by personal physicians of their choosing (so long as the doctors have agreed to affiliate with the IPA) at the physicians' offices. Thus, no central treatment facility it required. IPA affiliation, in such instances, in no way truncates a provider's freedom to maintain his or her private practice according to his or her own lights, or to treat non-HMO patients.

   "Group model" HMOs, in contrast, contract with one or more medical service groups on an independent contractor basis and typically furnish care at fixed loci.

   Perhaps most different from HMOs without walls are "staff model" HMOs, which directly employ physicians and treat subscribers at centrally integrated facilities.

5. Rhode Island Group Health Association, Inc. (RIGHA) is a group model HMO which is also engaged in supplying health care services to Rhode Islanders. RIGHA is certified under the federal HMO Act, 42 U.S.C. §§ 300e *et seq.*, and under § 42–62–9 of the Rhode Island Catastrophic Health Insurance Plan (CHIP) Act, but it has neither sought nor received licensure under the State HMO Act.

It competes with Blue Cross, RIGHA, and others in a health insurance market in which Blue Cross, historically, has been (and remains) far and away the dominant force.

Under the terms of the BCEWBP, Blue Cross currently offers its employees the option of obtaining Blue Cross or RIGHA coverage, but does not offer the option of membership in Ocean State or any other plans. Blue Cross (which, obviously, has its own scalpel to grind) is adamant in its opposition to offering any such alternatives. The intervenor has never requested that Ocean State enrollment become a permitted alternate form of coverage for BCEWBP purposes, and it has in these proceedings repeatedly professed that it has no intention to promulgate such a request in the future.

The dual option provision which plaintiffs challenge in count one of the complaint pronounces that:

Offer of health maintenance organization alternative to employees.—(a) Each employer shall include in any health benefits plan offered to its employees the option of membership in licensed health maintenance organizations which are qualified under the provision of § 42–62–9 and which are engaged in the provision of health services in the areas in which such employees reside; Provided however That the annual per-employee absolute dollar contribution by the employer for such alternative HMO coverage shall in no event be required by this section to exceed the employer's per-employee absolute dollar contribution to any other health benefits plans offered by such employer.

(b) If there is more than one licensed and qualified health maintenance organization which is engaged in the provision of health services in the area in which the employees of an employer reside and if—

(1) one or more of such organizations provides health services through professionals who are employed members of the staff of the organization or through an organized medical group (or groups) on a contractual basis, and

(2) one or more of such organizations provides such services through an individual practice association (or associations), then of the licensed and qualified health maintenance organizations included in a health benefits plan of such an employer pursuant to subsection (a) at least one shall be an organization which provides health services as described in (b)(1) and at least one shall be an organization which provides health services as described in (b)(2) directly above.

(c) An employer shall offer the option of membership in additional licensed and qualified health maintenance organizations if the additional licensed and qualified health maintenance organizations demonstrate that their service areas include the residence areas of employees (1) who do not reside in the service area of licensed health maintenance organizations already included in the employer's health benefits plans, or (2) to whom membership in licensed and qualified health maintenance organizations already included in the health benefits plans is not available because such organizations have closed their enrollment of eligible employees of such employer.

(d) An employer is not required to include in the health benefits plan offered to eligible employees the option of membership in the specific licensed and qualified health maintenance organization which initiated the request for inclusion in the health benefits plan: Provided, That the employer selects, in a manner consistent with this section, one or more other licensed and qualified health maintenance organizations that may not have made a request but are willing to be included: Provided further, That these latter health maintenance organizations are of the same type (i.e., the type described in paragraph (b)(1) of this section or the type described in (b)(2) of this section) and serve, or will serve at a minimum, the same area (in which the employer's or public entity's employees reside) individually or collectively as the

health maintenance organization which submitted the timely request. R.I.Gen.Laws § 27–41–27.

Plaintiffs' impugnment of the validity of § 27–41–27 derives its sustenance from the broad preemption language contained in § 514(a) of ERISA. The latter statute provides that, with certain exceptions, the federal act "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a). Citing, inter alia, *Rebaldo v. Cuomo*, No. 83 Civ. 8707 (S.D.N.Y. Mar. 13, 1984), *California Hospital Association v. Henning*, 569 F.Supp. 1544 (C.D.Cal.1983) and most notably the Supreme Court's recent decision in *Shaw v. Delta Air Lines,* — U.S. —, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), Blue Cross argues with considerable passion that § 27–41–27 comes within .§ 514(a)'s pervasive sweep and seeks summary judgment on that ground.[6]

Though they acknowledge the irrefragable breadth of § 514(a), the defendants and the defendant/intervenor nevertheless asseverate that the dual option provision is not preempted by ERISA. Their argument in this regard prescinds from reliance on the insurance savings clause contained in § 514(b)(2)(A) and on the language of § 514(d).[7]

The savings clause in question ordains that:

> Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.

29 U.S.C. § 1144(b)(2)(A).[8] The defendants and Ocean State, noting that the savings clause was specifically intended to preserve the traditional primacy of the states in the bailiwick of insurance regulation by exempting insurance laws from the reach of § 514(a), postulate a somewhat daedalian thesis hypothesizing that the dual option clause is a law which "regulates insurance" and thus is entitled to sanctuary vis-a-vis ERISA preemption. Both the defendants and the intervenor claim that the savings clause comprises not only shield but sword, and that it entitles them to summary judgment on count one of plaintiffs' complaint.

The defendants and Ocean State aver, moreover, that § 514 provides yet another safe harbor for Rhode Island's dual option provision. The intervenor sets its sights higher still, claiming that this self-same proposition supplies a further rationale for *brevis* disposition against Blue Cross. Section 514(d) states:

> (d) Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(b) of this title) or any rule or regulation issued under any such law.

29 U.S.C. § 1144(d). Armed with an arsenal comprised of affidavits and assorted regulatory directives which, taken together with the express terms of the National Health Planning and Resource Development Act of 1974 (Planning Act),[9] various

---

**6.** Neither the state defendants nor the intervenor have questioned the assertion that § 27–41–27 is a law which "relate[s] to [an] employee benefit plan ..." 29 U.S.C. § 1144(a).

**7.** As will be further explicated, *see* text *post,* the defendants and the defendant/intervenor maintain somewhat divergent positions with respect to the effect that § 514(d) should have on the court's disposition of the instant motions.

**8.** Section 514(b)(2)(B), which modifies § 514(b)(2)(A) and which forms the basis for the exception to the saving clause, is often referred to as the "deemer clause." It provides that:

> Neither an employee benefit plan described in section 1003(a) of this title, which is not exempt under section 1003(b) of this title (other than a plan established primarily for the purpose of providing death benefits), nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.

29 U.S.C. § 1144(b)(2)(B).

**9.** The Planning Act is found at 42 U.S.C. §§ 300k *et seq.*

regulations promulgated in relation thereto, and the Planning Act's legislative history, allegedly demonstrate the interrelationship between the passage of the dual option provision and Rhode Island's obligations under the federal planning statute, the parties opposing Blue Cross contend that preemption of the dual option proviso would "alter, amend [or] modify" another law of the United States. While the argument, as paraphrased above, is essentially a creature of Ocean State's manufacture, the state defendants make essentially the same point regarding the interplay between the mandates of the Planning Act and the enactment of § 27–41–27. But, taking a somewhat more conservative tack, they seek only a determination that there is a genuine issue of material fact as to whether preemption would "alter, amend, [or] modify" the federal statute.

## II.

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard applicable to the parties' cross motions for summary judgment on count one of the complaint. That rule provides that "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact …" then judgment "shall be rendered forthwith …" in favor of any party entitled thereto as a matter of law. Fed.R. Civ.P. 56(c); *see Gonsalves v. Alpine Country Club*, 563 F.Supp. 1283, 1285 (D.R.I.1983), *aff'd*, 727 F.2d 27 (1st Cir. 1984); *United Nuclear Corp. v. Cannon*, 553 F.Supp. 1220, 1226 (D.R.I.1982); *Milene Music, Inc. v. Gotauco*, 551 F.Supp. 1288, 1292 (D.R.I.1982). In determining the appropriateness of summary judgment, the court must look at the record "in the light most favorable to the party opposing the motion," *Emery v. Merrimack Valley Wood Products, Inc.*, 701 F.2d 985, 986 (1st Cir.1983) (quoting *Poller v. Columbia*

*Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)); *Santoni v. Federal Deposit Insurance Corp.*, 677 F.2d 174, 177 (1st Cir.1982); *Gonsalves*, 563 F.Supp. at 1285, and must indulge all inferences in that party's favor. *Emery*, 701 F.2d at 986; *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976).

The protagonists have extensively briefed the merits of their cross motions for summary judgment and have not skimped in filing supporting materials. But, there is a preliminary ravine which must be skirted before the court can traverse the summary judgment bridge. It is apodictic that a federal court lacks subject matter jurisdiction and may not make a Rule 56 determination in the absence of a genuine case or controversy.[10] *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982); *United States Parole Commission v. Geraghty*, 445 U.S. 388, 395, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980); *Duffy v. Quattrocchi*, 576 F.Supp. at 340. Two of the elements essential to a finding of justiciability are (i) that the controversy before the court is ripe for review, *see, e.g., Steffel*, 415 U.S. at 459, 94 S.Ct. at 1215; *Poe v. Ullman*, 367 U.S. 497, 507–09, 81 S.Ct. 1752, 1758–59, 6 L.Ed.2d 989 (1961), and (ii) that the party asserting the claim has the requisite standing to do so. *See, e.g., Sierra Club v. Morton*, 405 U.S. 727, 734–41, 92 S.Ct. 1361, 1365–69, 31 L.Ed.2d 636 (1972). Indeed, as Justice Frankfurter observed more than three decades ago, the doctrines of standing and ripeness

are but several manifestations … of the primary conception that federal judicial power is to be exercised to strike down legislation, whether state or federal, only at the instance of one who is himself

---

**10.** Article III's "case or controversy" requirement applies equally, of course, to a request for declaratory judgment as it does to a request for injunctive relief. *Steffel v. Thompson*, 415 U.S. 452, 458–60, 94 S.Ct. 1209, 1215–16, 39 L.Ed.2d 505 (1974); *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969), *Shell Oil Co. v. Noel*, 608 F.2d 208, 213 (1st Cir.1979); *Duffy v. Quattrocchi*, 576 F.Supp. 336, 340 (D.R.I.1983).

immediately harmed, or immediately threatened with harm, by the challenged action.

*Poe v. Ullman,* 367 U.S. at 503–04, 81 S.Ct. at 1755–56. And in the case at bar, the state defendants and Ocean State hoist the crimson flags of both ripeness and standing in support of their motion to dismiss.

The doctrine of ripeness requires that there be a "live and acute controversy" before the court. *Steffel v. Thompson,* 415 U.S. at 459, 94 S.Ct. at 1216. Thus, where the "threat of state action is imaginary, speculative, or chimerical," subject matter jurisdiction will not attach. *Shell Oil Co. v. Noel,* 608 F.2d at 213. Instead, Article III of the United States Constitution requires that a party invoking the jurisdiction of a federal court be able to demonstrate that "he has sustained or is in immediate danger of sustaining some direct injury" as a result of a statute's enforcement. *Massachusetts v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923).

Whether Blue Cross is exposed by these events to a clear and present danger depends, of course, on the likelihood that it can be/will be prosecuted for a violation of § 27–41–27 of the State HMO Act.[11] *See, e.g., Shell Oil Co. v. Noel,* 608 F.2d at 213. And that, in the first instance, turns on whether the plaintiffs have in some manner failed to comply with mandates which are enforceable against them. Indeed, it is manifest that plaintiffs' challenge to the dual option provision could not possibly be ripe if the strictures of the Act do not apply to Blue Cross here and now. This is, at bottom, the precise point made by the defense. In urging the court to grant their motions to dismiss, the movants argue that the plaintiffs' assault upon the dual option provision lacks the concreteness necessary

to catalyze the court's jurisdiction. They contend that, despite the seemingly unqualified command contained in § 27–41–27(a) that an employer "*shall* include ... the option of membership in licensed [and qualified] health maintenance organizations ..." (emphasis added) and the use of similar language in §§ 27–41–27(b)(2) and (c), the dual option provision is not self-executing, but instead, is activated only when and if an employer receives a request for inclusion from such an HMO. And, the argument runs, since Ocean State, the only organization which could make such an impetration, has no intention of doing so, Blue Cross is under no threat, no less a threat of imminent prosecution for a violation of § 27–41–27.

## III.

Whether or not the dual option provision is self-executing is an issue of first impression in this state.[12] Absent explicit guidance from the Rhode Island judiciary, it becomes this court's task, sitting pursuant to its diversity jurisdiction, "to vaticinate what the decision of the Rhode Island Supreme Court would be were that court faced with the issue." *Plummer v. Abbott Laboratories,* 568 F.Supp. 920, 921–22 (D.R.I.1983) (collecting cases). In fine, this court must now "make an informed prophecy as to the meaning and effect of [the] statute." *Scuncio Motors, Inc. v. Subaru of New England, Inc.,* 555 F.Supp. 1121, 1124 (D.R.I.1982), *aff'd,* 715 F.2d 10 (1st Cir.1983).

In determining whether the dual option provision automatically applies to every employer in Rhode Island irrespective of the initiation of a request for the furnishing of alternate modes of coverage,

---

**11.** The penalties and the enforcement mechanism of the State HMO Act are contained in § 27–41–21.

**12.** Contrary to the plaintiffs' suggestion, it cannot reasonably be said that Judge Almeida of the state superior court passed (nor even meaningfully commented upon) this issue in *Ocean State Master Health Plan, Inc. v. State,* No. 83–2801 (Providence County Super.Ct. Aug. 5, 1983). In that case, unlike the present one,

Ocean State had requested inclusion in an employee benefit plan, and the only issue before the superior court was at what point, in relation to the effective date of the State HMO Act, an employer was required to respond to that entreaty. As Judge Almeida noted in his memorandum of decision, "The sole issue before this Court [the state superior court] is the propriety of the timing of plaintiff's [Ocean State's] request for relief." *Id.* at 2.

this court is guided by principles of statutory construction which are well established in Rhode Island jurisprudence. It is beyond cavil that, ordinarily, the plain and obvious meaning of the language of a statute controls. *Formisano v. Blue Cross,* 478 A.2d 167 at 168–169 (R.I.1984); *see Roadway Express, Inc. v. Rhode Island Commission for Human Rights,* 416 A.2d 673, 674 (R.I.1980); *State v. Healy,* 410 A.2d 432, 434 (R.I.1980). Yet, there is "another rule of equal dignity in the canons of construction" to the effect that a court should not construe words according to their plain meaning if to do so would defeat the "discovered intendment of the legislature," *Warren Education Association v. Lapan,* 103 R.I. 163, 173, 235 A.2d 866, 872 (1967); *see also Angel v. Murray,* 113 R.I. 482, 486, 322 A.2d 630, 633 (1974), or would lead to an absurd, unjust, or unreasonable result. *See City of Warwick v. Almac's, Inc.,* 442 A.2d 1265, 1272 (R.I.1982). To merit literal application, the language of a statute must not only be "clear and unambiguous," but it must convey "a definite and sensible meaning that does not contradict an evident legislative purpose." *Rathbun v. Leesona Corp.,* 460 A.2d 931, 933 (R.I.1983).

Furthermore, in divining the legislative will, "[n]o sentence, clause or word should be construed as unmeaning or surplusage, if a construction can be legitimately found which will give force to and preserve all the words of the statute." *St. Clare Home v. Donnelly,* 117 R.I. 464, 470, 368 A.2d 1214, 1217–18 (1977); *see also Montaquila v. St. Cyr,* 433 A.2d 206, 214 (R.I.1981); *State v. Reis,* 430 A.2d 749, 752 (R.I.1981). Indeed, such tenets have, on occasion, led the Rhode Island Supreme Court to disregard the literal language of a statute in situations which bore a family resemblance to the present one. *See, e.g., Warren Education Association,* 103 R.I. at 172–74, 235 A.2d at 872–73; *Little v. Iannuccillo,* 100

R.I. 336, 339, 215 A.2d 421, 423 (1965); *McLyman v. Holt,* 51 R.I. 96, 100, 151 A. 1 (1930).[13]

■ While a court should disregard the literal and ordinary meaning of statutory terms only with the utmost caution, *Warren Education Association,* 103 R.I. at 173, 235 A.2d at 872, it cannot interpret the words of a law in a vacuum. *City of Warwick v. Almac's, Inc.,* 442 A.2d at 1272. The construction of statutes is a complex business at best. There must be a strong presumption that words mean what they say; but if phantasmagoric results are to be avoided, that presumption must at some point be rebuttable. There is a fine line to be walked which separates unacceptable judicial rewriting of statutes from salutary efforts judicially to synthesize the true meaning and intent which was in the collective minds of a legislative majority when any particular law was enacted. And, in the case at bar, the General Assembly's blunt pronouncement that "each employer shall include ...," and its use of other such seemingly categorical language, must nevertheless be viewed in the context of the entire statutory mosaic and in light of the reasonable intendment of the legislature.

■ While the General Assembly may not have directly qualified its use of the word "shall" in the several instances referred to, section (d) of § 27–41–27 provides that

[a]n employer is not required to include in the health benefits plan offered to eligible employees the option of membership in the specific licensed and qualified health maintenance organization *which initiated the request for inclusion* in the health benefits plan: Provided, That the employer selects, in a manner consistent with this section, one or more other licensed and qualified health main-

---

**13.** In *Warren Education Association,* for example, the state supreme court held that, despite the General Assembly's use of the facially premissive word "may", R.I.Gen.Laws § 28–9.3–4 was mandatory in nature and required that a complaint alleging a failure to bargain in good faith be brought to the State Labor Board before the

aggrieved party sought judicial intervention. 103 R.I. at 174, 235 A.2d at 872–73. Similarly, in both *Little v. Iannuccillo,* 100 R.I. at 339, 215 A.2d at 423, and *McLyman v. Holt,* 51 R.I. at 100, 151 A. 1, it was held that the seemingly imperative "shall" in each of the statutory provisions at issue must be read as precatory only.

tenance organizations that *may not have made a request* but are willing to be included: Provided further, That these latter health maintenance organizations are of the same type [as described in (b)(1) or (b)(2) of this section] and serve, or will serve at a minimum, the same area (in which the employer's or public entity's employees reside) ... as the health maintenance organization *which submitted the timely request.* (emphasis added).

Despite the lack of clarity elsewhere in § 27–41–27 regarding the triggering of the mandates contained therein, section (d) is cogent proof that the drafters both intended and envisioned that the dual option provision would only be activated when and if a request for inclusion was addressed to a particular employer. Indeed, construction of § 27–41–27(a) as self-executing would eviscerate § 27–41–27(d), stripping it of any coherent meaning or purpose, and reducing that provision to so much buzznacking. The plaintiff's suggestion that section (d) merely sets forth a "defense against a request by a second similar model HMO for inclusion," *see* Plaintiff's Brief at 10, is an anfractuous construction which is so patently inconsistent with the language employed by the General Assembly as to warrant summary rejection.

That the legislature could not have contemplated that § 27–41–27 would automatically apply to every employer in Rhode Island is, moreover, obvious when the nature and kind of obligations imposed by the dual option provision are considered. The offering of health care insurance under an employee benefit plan is an intricate financial and administrative affair. It requires, at the outset, that the health maintenance organization fashion some sort of a proposal outlining the terms and conditions of the coverage which it desires to supply. Only after a bid is submitted and subsequently accepted is the employer in any kind of position to offer the plan to its employees. If the employer *must* unilaterally offer the second option to its workforce, how does it go about doing so if the HMO does not deign to quote rates, supply explanatory material, fix benefits, or negotiate terms

and conditions for the master contract? Plainly, then, the statutory scheme contemplates not a solo flight by the employer, but the proffering of a further option arising out of a working partnership between the employer and the HMO. What the statute does, of course, is insure the employer's cooperation in this joint venture; and that goal is accomplished just as fully if the employer's obligation is seen as subject to the condition precedent of an initiative request by an eligible HMO.

Complicating the process to an even greater extent is the fact that the dual option provision does not require that an employer offer the option of membership in any conceivable health maintenance organization but, instead, requires that the provider be both licensed and qualified, *see* § 27–41–27(a), and further requires that under certain circumstances not only one but two different types of HMO coverage be offered. *See* § 27–41–27(b). The general mandate of § 27–41–27 is, moreover, also qualified by the provision that the annual per-employee dollar contribution for HMO coverage shall not exceed the employer's per-employee contribution to any other health plan. *See* § 27–41–27(a). Since the employer cannot calculate the ratable cost of its contribution in the absence of an agreement by the HMO provider to afford coverage, and an ancillary commitment by the latter as to the applicable group rate, interpretation of the mandate of § 27–41–27 as self-executing could well produce unjust or unreasonable results. Such an outcome is to be avoided in the art form of statutory construction. *City of Warwick v. Almac's, Inc.*, 442 A.2d at 1272.

Nor does the pourridie of unreasonableness which, on the plaintiffs' interpretation, would infect the law end with the considerations limned above. A broader view of the statutory scheme militates with equal, if not greater, force against principles of self-execution. Rhode Island's dual option provision applies to every employer in the state, no matter how small, *see* § 27–41–2(11) and is backed up by not insubstantial enforcement provisions. *E.g.*, § 27–41–21. There is no question, especially in view of

the fact that HMOs are (relatively speaking) a newly-emergent phenomenon in the health care industry, that as between a health maintenance organization and an employer (even those employers which are amongst the largest and most sophisticated ·ı the state), the former is in a much better position initially to evaluate whether it can provide coverage which comes within the constraints imposed by § 27–41–27 and therefore to ignite the process leading to inclusion of a particular HMO in a health benefits plan. It is, consequently, illogical to assume that the General Assembly would have put the relatively unknowledgeable employer at its peril, demanding that it grope for appropriate (i.e., ready, willing, able, and cost-effective) HMO needles from within the health care haystack. If the Rhode Island General Assembly is to be given credit for any insight into the problem, it is far more likely that the legislature intended to limit the employer's search to HMOs which put out the welcome mat as opposed to requiring aimless journeys down cul-de-sacs and blind alleys, wasting time, effort and funds in knocking on closed doors.

There is yet another compelling reason why the notion that the dual option provision was meant to be self-executing simply does not make sense. The State HMO Act was passed with a view toward expanding diversity amongst health care providers with the ultimate aim of containing the skyrocketing costs of health care delivery. As high-minded and commendable as these goals might be, however, they are nonetheless anchored to the reality that the provision of alternate formats for health care can only develop as rapidly as do the entities which provide such services. At the time the State HMO Act was enacted, the legislature could not have forecast whether any, let alone how many, HMOs would qualify for inclusion under § 27–41–27; nor certainly, the extent to which such organizations would be able to accommodate individuals who were interested in subscribing to their services. Faced with such imponderables, it is far-fetched that the General Assembly, in enacting § 27–41–27, intended to promulgate an across-the-board requirement that each and every employer in Rhode Island offer HMO membership as part of its health care benefit plan.

Lastly, but not unimportantly, the reasonableness of interpreting the State HMO Act's dual option provision as being non-self-executing is further supported by the fact that two similar, albeit not identical, dual choice provisions have been construed in the same manner by the agencies charged with their regulation. *See* R.I.D. B.R.Reg. XIX (interpreting § 42–62–9 of the CHIP Act) and 42 CFR § 110.802 (interpreting § 1310 of the Federal HMO Act). *Cf. CBS, Inc. v. FCC,* 453 U.S. 367, 382, 101 S.Ct. 2813, 2823, 69 L.Ed.2d 706 (1981) (court should give considerable deference to agency's construction of a statute); *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 858 n. 25, 95 S.Ct. 2051, 2063 n. 25, 44 L.Ed.2d 621 (1975) (same); *Sweeney v. Murray,* 732 F.2d 1022 at 1029 (1st Cir.1984) (same); *Bangor & Aroostook Railroad Co. v. ICC,* 574 F.2d 1096, 1104 n. 8 (1st Cir.), *cert. denied,* 439 U.S. 837, 99 S.Ct. 121, 58 L.Ed.2d 133 (1978) (same).

## IV.

For the foregoing reasons, the court is persuaded that the directives contained in § 27–41–27 were not meant to be self-executing. A contrary holding would vanquish the "discovered intendment of the legislature," *Warren Education Association,* 103 R.I. at 173, 235 A.2d at 872, and would disrupt the smooth functioning of the state statutory mosaic as a whole. And, since Ocean State, the only entity which could presently trigger those mandates, has neither done so nor evinced any intention of doing so, count one of the complaint offers no zoetic controversy which this court can presently adjudicate.[14]

---

**14.** In view of this conclusion, it is not necessary to determine whether Blue Cross has standing to assert the claim contained in court one of its complaint nor whether there is an "actual controversy" as to that count within the meaning of the Declaratory Judgment Act. It is likewise superfluous to comment further on the merits of Blue Cross' ERISA preemption challenge or on the cross motions for *brevis* disposition on the interdicted statement of claim.

This court is mindful of Blue Cross' perceived financial stake in attempting to block what the plaintiffs doubtless view as unwarranted state favoritism of alternate forms of health care delivery. The court is similarly cognizant of the substantial public interest which attaches to the twin-engined societal effort to improve the health care delivery system while at the same time effecting much-needed cost containment. Yet, the federal judiciary does not have the luxury of rendering advisory opinions on points which are of an academic nature only. In the absence of a dispute ripe for adjudication in the legal sense, these itches cannot be scratched by this court. Count one of plaintiffs' complaint must therefore be, and hereby is, dismissed without prejudice.[15]

*It is so ordered.*

---

15. It would appear that counts two and eight, as well as counts three, six and seven (to the extent that these latter three counts relate to the dual option provision) are subject to the same jurisdictional infirmities. Because the court does not have a motion for dismissal of these counts before it, however, the court is reluctant to take any action sua sponte without affording the plaintiffs an opportunity to contest such a disposition.